[L.A. No. 31798. Oct. 25, 1984.]

JEROME J. NASH, Plaintiff and Respondent, v.
CITY OF SANTA MONICA et al., Defendants and Appellants.

COUNSEL

Robert M. Myers, City Attorney, Stephen S. Stark, Assistant City Attorney, Karl M. Manheim and Susan L. Carroll, Deputy City Attorneys, Michael Heumann, Stephen P. Wiman, David Pettit and Mary Ann Yurkonis for Defendants and Appellants.

Natalie E. West, City Attorney (Berkeley), Penny Nakatsu, Terry B. Friedman, Elyse S. Kline, Jana Zimmer, Merced Martin, Marc B. Mihaly, Shute, Mihaly & Weinberger and James R. Grow as Amici Curiae on behalf of Defendants and Appellants.

Rich & Ezer and Mitchel J. Ezer for Plaintiff and Respondent.

Bonelli, Heib, Fuchs & O'Neal, Stanley Sapiro, Stacey & Jones, Stephen L. Jones, Ronald A. Zumbrun, John H. Findley, Robert D. Links, Andrew M. Colvin, Colvin, Martin & Links, Thomas L. Berkley, Latham & Watkins and George Kimball as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**GRODIN, J.**—In this case we are called upon to determine the validity of Santa Monica City Charter section 1803, subdivision (t)—which prohibits removal of rental units from the housing market by conversion or demolition absent a removal permit from the Santa Monica Rent Control Board—as it applies to prevent the owner of an apartment building from evicting his tenants and tearing the building down. The trial court held that the ordinance, as so applied, constitutes a deprivation of property without due process of law in violation of the Fourteenth Amendment of the United States Constitution and article I, section 7, subdivision (a) of the California Constitution.

As is so often the case in constitutional litigation, the issues appear different depending upon one's perspective. For Santa Monica, the challenged provision is nothing more than a land use regulation designed to effectuate the purposes of the city's rent control ordinance of which it is a part, while Nash views it as a means of forcing him to remain a landlord despite his wish to "go out of business"—an interest which he asserts is among the "basic values 'implicit in the concept of ordered liberty.' [Citations.]" (*City*

*of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 266 [85 Cal.Rptr. 1; 466 P.2d 225, 37 A.L.R.3d 1313].) There is a degree of merit in both perspectives, but neither is adequate to resolve the issue presented. Rather, as we shall explain, what is required is a realistic appraisal of the impact of the challenged provision upon Nash and the alternatives available to him, on one hand, and of the relationship of that provision to the objectives of the rent control ordinance, on the other. On the basis of that appraisal, we will conclude that while the challenged provision may be said to implicate interests which are entitled to a high degree of constitutional protection— including one's choice whether to remain in a particular business or occupation—the actual limitation upon those interests posed by the challenged provision is minimal and not significantly different from other, constitutionally permissible, limitations upon the use of private property imposed by government regulation. At the same time, the provision, by protecting existing tenants against eviction and the scarce supply of residential housing in Santa Monica against further erosion, clearly serves important public objectives. Consistent with the settled precedent of this court, and the United States Supreme Court, we shall hold that section 1803, subdivision (t), is not constitutionally infirm.

## I.

The vacancy rate for rental housing in Santa Monica was, at the time of trial, approximately 1.7 percent. In the late 1970's, the city was confronted with a severe shortage of its traditionally scarce housing stock, precipitated in large measure by what came to be known as the "Demolition Derby." This term was coined to describe a 15-month period during which Santa Monica landlords razed over 1,300 rental units and converted hundreds of other such units into condominiums. Rental housing units were removed from the market at 10 times the rate of removals (relative to population) of neighboring Los Angeles.[1]

In 1979, the citizens of Santa Monica by initiative added article XVIII to the city's charter. This new article provided for a rent control board with the authority to set and adjust maximum rents and to control the removal of rental units from the housing market. (§ 1803.)[2] The rent control law also

---

[1]City of Santa Monica, Housing Element Technical Report (Jan. 1981) at pages 54, 142, 233.

[2]Unless otherwise indicated all section references are to Santa Monica City Charter, article XVIII.

regulates tenant evictions. (§ 1806.) Section 1803, subdivision (t)[3] of the rent control law requires a landlord to obtain a permit before demolishing a building. Where the landlord both owns habitable property and does not wish to rebuild, a demolition permit will be granted only upon a finding that (1) the building is not occupied by persons of low or moderate income, (2) cannot be afforded by persons of low or moderate income, (3) removal will not adversely affect the housing supply and (4) the owner cannot make a reasonable return on his investment.

Respondent Nash was a 17-year-old student when, approximately a year before the rent and demolition controls were enacted, his mother obtained on his behalf a $260,000 apartment building in Santa Monica.[4] He soon became disenchanted, however, with operating rental housing: "There is only one thing I want to do, and that is to evict the group of ingrates inhabiting my units, tear down the building, and hold on to the land until I can sell it at a price which will not mean a ruinous loss on my investment."

Nash began the process of filing for a removal permit, so that he might indeed destroy the building and allow the land to appreciate in value. Because he concededly could earn a fair return on his investment, however, it soon became clear to him that he would not be issued the permit. Thus, rather than complete the statutorily mandated, but probably, for him, futile removal permit application process, Nash sought to circumvent the regulations by filing a petition for writ of mandate in Los Angeles Superior Court.

At trial, Nash admitted that if the apartment were left standing and remained occupied, he could earn a fair return on his investment in the prop-

---

[3]Section 1803, subdivision (t) provides as follows: "(t) REMOVAL OF CONTROLLED RENTAL UNIT FROM RENTAL HOUSING MARKET: Any landlord who desires to remove a controlled rental unit from the rental housing market by demolition, conversion or other means is required to obtain a permit from the Board prior to such removal from the rental housing market in accordance with the rules and regulations promulgated by the Board. In order to approve such a permit, the Board is required to make each of the following findings; [¶] (1) That the controlled rental unit is not occupied by a person or family of very low income, low income or moderate income. [¶] (2) That the rent of the controlled rental unit is not at a level affordable by a person or family of very low income, low income, or moderate income. [¶] (3) That the removal of the controlled rental unit will not adversely affect the supply of housing in the City of Santa Monica. [¶] (4) That the landlord cannot make a fair return on investment by retaining the controlled rental unit. [¶] Notwithstanding the foregoing provisions of this subsection, the Board may approve such a permit: [¶] (1) If the Board finds that the controlled rental unit is uninhabitable and is incapable of being made habitable in an economically feasible manner, or [¶] (2) if the permit is being sought so that the property may be developed with multifamily dwelling units and the permit applicant agrees as a condition of approval that the units will not be exempt from the provisions of this Article pursuant to Section 1801(c) and that at least fifteen (15) per cent of the controlled rental units to be built on the site will be at rents affordable by persons of low income."

[4]The apartment became respondent's when he reached the age of majority.

erty. He further conceded that demolition of his building would adversely affect the supply of housing in Santa Monica. The court found the units in Nash's building were occupied by persons of very low, low, or moderate income, and that the rents charged were affordable by them. Thus, the trial court found the prerequisites to the acquisition of a demolition permit had not been satisfied.

Based on these findings, the trial court accepted Nash's argument that the challenged provision operated to deprive Nash of property without due process of law. It also declared, *sua sponte,* that the provision resulted in a taking of his property without just compensation. It ordered a writ of mandate issue commanding the City of Santa Monica and the Santa Monica Rent Control Board to grant Nash a removal permit for his property.

## II.

■ We begin by examining the nature of Nash's claim. Notwithstanding the trial court's alternative ruling, Nash expressly disclaims any contention that the city's ordinance effects a "taking" of his property in violation of federal or state Constitutions. Nor, in light of applicable authority, would such a claim appear to have merit. In *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104 [57 L.Ed.2d 631, 98 S.Ct. 2646], the United States Supreme Court considered a constitutional challenge to New York City's Landmark Preservation Law, which authorizes a city commission to prohibit the demolition of designated historic structures. The court held that no taking was involved in application of the ordinance to plaintiff, which desired to modify its railroad terminal by construction of an office building in its place, since the regulation did not interfere with the owner's "primary, investment-backed expectations," and did not render the owner unable to receive a reasonable return on his investment. (*Id.,* at p. 136 [57 L.Ed.2d at p. 656]; see also *Maher* v. *City of New Orleans* (5th Cir. 1975) 516 F.2d 1051, cert. den. (1976) 426 U.S. 905 [48 L.Ed.2d 830, 96 S.Ct. 2225].) It is undisputed that both prongs of the *Penn Central* test are met here. We are aware of no authority which would impose different requirements under the California Constitution. (See *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25], affd. 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138].)

Nash asserts that he is "not seeking compensation from the City of Santa Monica for being forced to stay in the apartment-rental business, but only the right to go out of that business." Conceding that there are no decisions precisely in point, and without identifying any particular constitutional provision, Nash contends that there must be limitations upon the power of the

state to compel a person to pursue a particular business or occupation against his will.

We agree. The Thirteenth Amendment to the United States Constitution prohibits involuntary servitude. This court has spoken of the basic liberty to pursue and obtain happiness by engaging in the common occupations of the community. (See *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].) The exercise of state power to force upon an individual a career chosen by the state would surely raise substantial questions of constitutional dimension.

The City of Santa Monica has not done that to Nash, however. Rather, it has told him that so long as tenants remain in his apartment units, and so long as he continues to receive a fair rate of return on his investment, he may not evict them and demolish the building. Nash remains free to minimize his personal involvement by delegating responsibility for rent collection and maintenance to a property manager. He remains free under the ordinance to withhold rental units from the market as they become vacant. And, he remains free to sell his property and invest the proceeds elsewhere. The problem arises from the fact that Nash prefers to do none of these things, but to demolish the building and keep the land beneath as an investment. This he claims an absolute right to do, as owner of the property.

■ The state Constitution protects the rights of "acquiring, possessing, and protecting property . . . ." (Cal. Const., art. I, § 1.) Both federal and state Constitutions protect against deprivation of property without due process of law. Yet, " '[i]t is thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires.' " (*Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 488 [234 P. 381, 38 A.L.R. 1479].) Thus, an ordinance restrictive of property use will be upheld, against due process attack, unless its provisions "are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." (*Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 395 [71 L.Ed. 303, 314, 47 S.Ct. 114, 54 A.L.R. 1016].)

Nash seeks to elevate the standard of constitutional review from the "rational relationship" test normally used in appraising the validity of property regulation to a more restrictive "strict scrutiny" test, on the ground that the Santa Monica ordinance implicates his "fundamental right" to cease doing business as a landlord. His argument is that the city has conditioned the exercise of that "fundamental right" upon the relinquishment of his

right not to sell his property, and that this is constitutionally impermissible, absent a compelling governmental interest which, he asserts, does not exist.

Even were we to accept Nash's theory we would be hard pressed to say that there is no compelling governmental interest in the preservation of scarce rental housing against destruction.[5] Chief Justice Bird's opinion presents a cogent argument that on the facts of this case the governmental interest is compelling indeed.

 We find it unnecessary to reach that level of analysis, however, since in our view the indirect and minimal burden imposed upon Nash's asserted liberty interest by the demolition control provisions of the Santa Monica ordinance does not warrant departure from the traditional tests used to determine the validity of economic regulation. (See *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 602 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 8 [39 L.Ed.2d 797, 803-804, 94 S.Ct. 1536]; cf. *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219].) All regulation of property entails some limitation upon the liberty of the owner; and, to the extent that the regulation limits the uses to which the property may be put, it entails limitation upon the owner's liberty to pursue his chosen occupation or business at that location. If the owner wishes to pursue his preference, he may be constrained to sell his property and move elsewhere. If the value of his property has decreased as a result of the regulation, he may perceive that to be an undesirable alternative, and to that extent feel economically constrained to continue in his present field of endeavor. Yet, the existence of these legal and de facto limitations upon his freedom of choice do not operate to subject the property regulation to a strict scrutiny test, under modern legal principles. (See *Agins* v. *City of Tiburon, supra,* 24 Cal.3d 266, 277, affd. 447 U.S. 255.)

---

[5]Santa Monica is not alone in its view that demolition controls are required to preserve rental housing. (See *Groch* v. *City of Berkeley* (1981) 118 Cal.App.3d 518, 521, fn. 1 [173 Cal.Rptr. 534] [upholding, against attack for vagueness, a similar anti-demolition ordinance which required a finding that "demolition would not be materially detrimental to the housing needs and public interest of the affected neighborhood and the City of Berkeley"].) Under recent state legislation, the conversion or demolition of existing residential dwelling units occupied by persons and families of low or moderate income within the coastal zone (as defined in Pub. Resources Code, § 30000 et seq.) is not authorized unless provision has been made for the replacement of such dwelling units with units for persons and families of low or moderate income. (Gov. Code, § 65590.) (See also *Flynn* v. *City of Cambridge* (1981) 383 Mass. 152 [418 N.E.2d 335, 338-339, 21 A.L.R.4th 1075] ["If the power to control rents is to be anything more than an interim measure effective for only the short period needed to convert the entire rental housing stock, it must include by implication the power to make reasonable regulations governing removals from the rental housing market"].)

The strict scrutiny standard which Nash invokes would call into question a variety of land use regulations which have thus far withstood constitutional attack. Ordinances which prohibit demolition of historic monuments, such as the one upheld in *Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. 104, not only limit the freedom of choice of the owner as to the use of his property, and as to the type of business or occupation he may engage in upon the premises, but also impose upon the owner, as a minimal duty which he cannot legally escape without sale, the obligation to maintain the premises in a state of repair. (*Id.,* at p. 111 [57 L.Ed.2d at p. 640]; *Maher, supra,* 516 F.2d at p. 1066, fn. 85; see also *Figarsky* v. *Historic District Commission, etc.* (1976) 171 Conn. 198 [368 A.2d 163] [upholding an order denying permission to demolish a building and requiring certain repairs instead].)

In the arena of landlord-tenant law, demolition controls may be viewed as an adjunct to limitations upon eviction which have generally been upheld by the courts (see *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 148 [130 Cal.Rptr. 465, 550 P.2d 1001]). Such limitations, depending upon the context, may similarly inhibit an owner's desire to curtail his function as landlord. (See, e.g., *Grace* v. *Town of Brookline* (1979) 379 Mass. 43 [399 N.E.2d 1038, 1046] [upholding prohibition against eviction in condominium conversion cases even though they "limit[ed] the property owners' right to remove units from the rental market"]; *Puttrich* v. *Smith* (1979) 170 N.J.Super. 572 [407 A.2d 842, 843] [upholding prohibition against conversion to personal use, on grounds "the legislature could constitutionally decide . . . that an owner's right to utilize his property must yield to a tenant's interest in keeping his home"]; see also, *Stamboulos* v. *McKee* (1975) 134 N.J.Super. 567 [342 A.2d 529]; *Loeterman* v. *Town of Brookline* (D.Mass. 1981) 524 F.Supp. 1325.)

Nash is not being called upon to operate a business or engage in a profession unrelated to the property; his landlordly obligations are those which arise out of the ownership of the sort of property which he acquired. As Justice Holmes said, in rejecting a Thirteenth Amendment attack by a landlord upon an ordinance which made it a misdemeanor to fail to furnish certain services to tenants: "It is true that the traditions of our law are opposed to compelling a man to perform strictly personal services against his will even when he has contracted to render them. But the services in question ['water, heat, light, elevator, telephone, or other services as may be required by the terms of the lease and necessary to the proper or customary use of the building'] although involving some activities are so far from personal that they constitute the universal and necessary incidents of modern apartment houses. They are analogous to the services that in the old law might issue out of or be attached to the land." (*Marcus Brown Holding Co.,*

*Inc.* v. *Feldman* (1921) 256 U.S. 170, 199 [65 L.Ed. 877, 889, 41 S.Ct. 465]; accord, *Marquam Investment Corp.* v. *Beers* (1980) 47 Ore.App. 711 [615 P.2d 1064].)

Finally, insofar as Nash feels constrained by the ordinance to sell his property rather than undertake other alternatives available to him (*ante,* p. 101), he is in no worse position than if the City of Santa Monica were to exercise its power of eminent domain to compel a sale to private parties— a procedure recently upheld in a unanimous decision by the United States Supreme Court. (*Hawaii Housing Authority* v. *Midkiff* (1984) 467 U.S. 229 [81 L.Ed.2d 186, 104 S.Ct. 2321].) Indeed, he is in a better position, since he retains the option of continuing to own the property and to operate it at what he concedes to be a fair rate of return. Thus, Nash's argument that the ordinance unconstitutionally impinges upon his right to retain property rather than to sell it simply does not hold water.[6]

In support of his attack upon section 1803, subdivision (t), Nash relies upon snippets of dicta from opinions which, upon close analysis, are seen to have scant bearing upon the issue. In *Bowles* v. *Willingham* (1944) 321 U.S. 503 [88 L.Ed. 892, 64 S.Ct. 641], for example, in which the Supreme Court upheld the rent control provisions of the Emergency Price Control Act of 1942, the court made reference to the fact that the statute "provided that '. . . [it] shall [not] be construed to require any person to sell any commodity or to offer any accommodations for rent.'" (*Id.,* at p. 517 [88 L.Ed. at p. 905].) Nash suggests that but for this provision the statute would have been unconstitutional, but that is quite clearly not what the opinion says. The federal statute—unlike the Santa Monica ordinance—established maximum rentals for classes of dwellings, without regard to the situations of individual landlords. The portion of the opinion in which the quoted language appears discusses a contention that the statute could have the effect of requiring a particular landlord to remain in business even where the activity was producing less than a "fair return," and thus amounts to an invalid "taking." The court responded that since the statute contained an "opt-out" provision, that issue was not before the court. The entire discus-

---

[6]Nash does not suggest that the parcel which he now owns in Santa Monica has some personal or sentimental value to him which distinguishes it from other property which Nash might purchase with the proceeds. Nash has not lived in any of the apartments, and his plans for the property do not include any personal use. Rather he has held the property, and plans to hold it, in the manner typical of personal or corporate investors in real estate, i.e., purely as a form of economic investment. To the extent that selling his property is Nash's only alternative to remaining in business as a landlord, the resulting detriment, if any, can only be economic in nature.

Nash contends, and we assume, that the value of his property in the market place is adversely affected by rent control. It is quite clear, however, that the adverse economic effects of land use regulation do not give rise to a constitutional claim so long as the property retains value. (*Agins* v. *City of Tiburon, supra,* 24 Cal.3d 266.)

sion has no relevance to Nash, who concedes that he is receiving a fair return, and who asserts no "taking" claim.[7]

On the contrary, the one reported decision which *does* pass upon antidemolition controls similar to those contained in section 1803, subdivision (t) upholds their constitutionality against both taking and due process challenge. In *Fresh Pond Shopping Center, Inc.* v. *Callahan* (1983) 464 U.S. 875 [78 L.Ed.2d 215, 104 S.Ct. 218], the plaintiff had purchased property, on which an apartment house was situated, that was located next to a Sears department store. Fresh Pond owned the shopping center in which Sears was located, and leased land to Sears for a store and a parking area. Part of the parcel of land that had been leased to Sears had been taken by eminent domain, reducing the size of the Sears parking lot. In order to replace the lost parking spaces, and pursuant to its lease agreement, Fresh Pond purchased the adjacent property with the intention of demolishing the building and paving over the entire parcel.

At the same time, the City of Cambridge was on the verge of enacting an ordinance designed to preserve its supply of rent controlled housing. The ordinance included a provision which abolished the previous right of a Cambridge property owner to cease being a landlord by removing its property from the rental housing market. Under the ordinance, an owner who sought to remove property from housing use, and to evict a tenant in order to effect this removal, first had to obtain a "removal permit" from the rent control board. If the board chose to deny the permit, the ordinance prohibited the removal and required the landlord to maintain the property as rental housing.

---

[7]Nash relies also upon *Textile Workers* v. *Darlington Co.* (1965) 380 U.S. 263 [13 L.Ed.2d 827, 85 S.Ct. 994], which held that the National Labor Relations Act does not prohibit an employer, even for antiunion reasons, to go out of business entirely, and upon dicta in that opinion to the effect that the contrary proposition "would represent such a startling innovation that it should not be entertained without the clearest manifestation of legislative intent or unequivocal judicial precedent." (*Id.*, at p. 270 [13 L.Ed.2d at p. 834].) Nothing in that opinion suggests that the contrary proposition would be unconstitutional, however, and in any event a rule prohibiting a landlord from demolishing a building is clearly of a quite different order from a rule which would require a textile manufacturer to continue manufacturing textiles. The Supreme Court's views as to the issue presented here are more accurately reflected in its opinion in *Penn Central, supra,* and in *Fresh Pond, infra.*

Finally, Nash relies upon *Robinson* v. *Diamond Housing Corporation* (D.C.Cir. 1972) 463 F.2d 853, which upheld limitations upon retaliatory evictions, and upon the following dicta in that case: "None of this is to say that the landlord may not go out of business entirely if he wishes to do so or that the jury is authorized to inspect his motives if he chooses to commit economic harakiri. There would be severe constitutional problems with a rule of law which required an entrepreneur to remain in business against his will." (*Id.*, at p. 867.) The issue posed by the dicta was not presented in the case, however, nor was that issue considered in the context of an ordinance, such as Santa Monica's, aimed at preserving housing for low or moderate income tenants.

The purchase and sale agreement for the property at issue was executed in June 1979 before the enactment of the ordinance later challenged by Fresh Pond. The actual sale did not occur, however, until two days after the ordinance was enacted.

Within two months Fresh Pond was prepared to evict its new tenants and level the apartment in which they were living. The company sought removal permits from the Cambridge Rent Control Board to vacate the building— only one of six apartments was actually occupied—and demolish it according to its original purpose.

The rent control board denied the applications. On appeal, the United States Supreme Court left standing the decision of the Massachusetts Supreme Judicial Court, which earlier had affirmed the rent control board's denial of Fresh Pond's applications for removal permits. While the United States Supreme Court dismissed the appeal of Fresh Pond for want of a substantial federal question, the issues presented by the facts of the case[8] were necessarily decided and the judgment has the force of binding precedent. As the sole dissenter from the judgment, Justice Rehnquist, wrote: "[The issues] might be postponed or avoided if the case were here on certiorari, but the case is an appeal; we act on the merits whatever we do." (464 U.S. at p. 875 [78 L.Ed.2d at p. 215, 104 S.Ct. at p. 218].) Thus, while Nash's contentions with respect to the California Constitution are left to this court for response, the United States Supreme Court has addressed the matter and found the assertion of the unconstitutionality of an ordinance nearly identical to Santa Monica's, by one in almost precisely Nash's position, unavailing for purposes of federal constitutional law. The views of Justice Rehnquist—that the Cambridge ordinance represented a "taking" without just compensation—were apparently rejected by his eight colleagues, and in any event form no part of Nash's contention here.

Turning to the California Constitution, we find no persuasive authority, in precedent or in logic, for a different result.[9] The applicable test requires

---

[8] These included both a takings and a due process challenge to the operation of the ordinance.

[9] Nash relies on dicta in *Department of Public Works* v. *San Diego* (1932) 122 Cal.App. 159, 166-167 [10 P.2d 102], that "[w]hile the police power may limit and restrict the uses to which an owner may put his property, it may not compel him to use such property for a particular purpose if he prefers to abandon such a use thereof." That case involved an original proceeding in mandate, brought by the state Department of Public Works and the state engineer under the Dam Act of 1929 (Stats. 1929, p. 1505) against the owner and lessee of a dam, to compel the respondents to reconstruct the dam and its buttresses in accordance with more recent principles of dam construction. The court held that the statute did not give the state officials authority "to compel either the rebuilding or the continued operation of such a dam." (*Id.*, at p. 165.) In the process of reaching that conclusion, the court suggested that a contrary interpretation "would, at least so far as the respondent company is concerned, be in violation of article I, section 14, of the Constitution of Cali-

that the regulation be "procedurally fair and reasonably related to a proper legislative goal. The wisdom of the legislation is not at issue in analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute." (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].) Nash does not challenge the procedural fairness of the ordinance; and, as we have discussed (*ante,* at p. 105), in the context of a land-use ordinance the requirement of section 1803, subdivision (t), that a predemolition removal permit must be obtained before a landlord may level his or her rental units is reasonably related to the legitimate goal of maintaining adequate rental housing for Santa Monica's citizens. There can be no doubt that the relationship of the ordinance to the public welfare is both "real and substantial." (*Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, 609.)

We conclude the questioned provision, as applied to respondent Nash, is valid. Accordingly, we reverse the judgment below.

Kaus, J., Broussard, J., and Reynoso, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I concur in the result. However, I would rest the holding on somewhat different grounds.

The majority attempt to finesse Nash's personal liberty claim by concluding that the ordinance is essentially an economic regulation which affects Nash's ability to use his private property as he wishes, not his right to cease performing the duties of a landlord. (See maj. opn., *ante,* at pp. 99, 103-104.) In my view, this line of reasoning elevates formal logic over practical reality.

Prior to the enactment of demolition controls, Nash could have razed his building and used the property for something other than residential leasing. Now, he is reduced to the single option of selling the property. Clearly, the ordinance has made it more difficult to cease being a landlord.

In effect, the majority employ the distinction between "direct" and "indirect" burdens on constitutional rights as a means of avoiding Nash's personal liberty claim. This distinction obscures the actual impact of the challenged enactment. If the city had fined Nash one dollar for ceasing to be a

fornia and of the fourteenth amendment to the Constitution of the United States, as taking private property for public uses without compensation." (*Id.,* at p. 166.)

*San Diego* is clearly distinguishable on its facts. (*People* v. *Greene* (1968) 264 Cal.App.2d 774, 779 [70 Cal.Rptr. 818].) Even on the facts of that case, the court's dicta concerning the taking of private property without compensation is dubious in light of cases like *Penn Central, supra,* 438 U.S. 104. Moreover, Nash asserts no takings claim here.

landlord, the majority would have had no difficulty finding that the asserted personal liberty interest had been burdened. Practically, the ordinance imposes a far greater burden than a small fine. Nevertheless, since that burden is "indirect and minimal" (maj. opn., *ante,* at p. 104), the majority conclude that it does not warrant strict scrutiny. (See generally *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 288-290 [172 Cal.Rptr. 866, 625 P.2d 779] (conc. opn. of Bird, C. J.).)

I would acknowledge that Nash's practical ability to cease being a landlord has been burdened. Further, inasmuch as the duties of a landlord necessarily involve the rendering of personal services, I agree with Justice Mosk that the right to cease being a landlord is constitutionally protected. (See dis. opn., *post,* at p. 114.) The freedom to withhold personal services is a corollary of the basic liberty to pursue and obtain happiness by engaging in the common occupations of the community. (See *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].)[1]

However, applying strict judicial scrutiny, I have no difficulty finding that the ordinance was necessary to serve a compelling governmental objective. Housing is a basic necessity of life. The provision of housing for every California family is, in the words of the Legislature, "a priority of the highest order." (Gov. Code, § 65580, subd. (a).)

The demolition controls were enacted in response to a demonstrated propensity on the part of Santa Monica landlords to destroy rental housing units. During the so-called "Demolition Derby," landlords razed over 1,300 rental units in a 15-month period. The dissent's assertion that the city could have halted this march of destruction by less restrictive means is mere conjecture.

Further, the ordinance imposes only a minimal constraint on Nash's freedom. As the majority point out, he can escape from the landlord business by the simple expedient of selling his property or withholding rental units from the market as they become vacant. Nash does not contend that this particular piece of property is especially important to him or that a sale would harm his ability to provide for himself or his dependents. In short,

---

[1]For purposes of this discussion, I assume that Nash would, as a practical matter, have no alternative but to perform substantial personal services were he to continue in the apartment rental business. The record is not entirely clear on this point. Nash might have been able to avoid performing the services that were distasteful to him by, for example, placing his rental units in trust. However, in view of my conclusion that the ordinance passes constitutional muster under the standard of strict scrutiny, I find it unnecessary to delve further into this question.

the ordinance burdens Nash's right to withhold personal services only by limiting his ability to maximize the profits from his property. Though this is *a* burden, it is not an unduly harsh one in view of the city's compelling interest in providing housing for its residents.

Accordingly, I concur in the judgment.

**MOSK, J.**—I dissent.

As Justice Frankfurter wrote in *Bay Ridge Co.* v. *Aaron* (1948) 334 U.S. 446, 484 [92 L.Ed. 1502, 1527, 68 S.Ct. 1186], "On the question you ask depends the answer you get."

In this case if the question is whether a municipality may exercise its police power to reasonably regulate the rental business, the answer is: generally it may do so. But if the question is whether a city may compel a landlord to remain in business against his will, and give him only the alternative of a forced sale, the answer is: not in a democratic society.

The majority primarily consider the former question. In my view the latter issue is relevant under the facts of this case. Thus our answers differ.

I begin with the disbelief of the United States Supreme Court that one may be prevented from going out of business. In *Textile Workers* v. *Darlington Co.* (1965) 380 U.S. 263, 270 [13 L.Ed.2d 827, 834, 85 S.Ct. 994], Justice Harlan wrote for a unanimous court: "A proposition that a single businessman cannot choose to go out of business if he wants to would represent such a startling innovation that it should not be entertained without the clearest manifestation of legislative intent or unequivocal judicial precedent . . . . We find neither."

This is followed by the opinion of Judge J. Skelly Wright in *Robinson* v. *Diamond Housing Corporation* (D.C. Cir. 1972) 463 F.2d 853, 867: "None of this is to say that the landlord may not go out of business entirely if he wishes to do so or that the jury is authorized to inspect his motives if he chooses to commit economic harakiri. There would be severe constitutional problems with a rule of law which required an entrepreneur to remain in business against his will."

Curiously the city relies on the district court opinion in *Flood* v. *Kuhn* (S.D.N.Y. 1970) 316 F.Supp. 271, 274, affd. 443 F.2d 264, affd. 407 U.S. 258 [32 L.Ed.2d 728, 92 S.Ct. 2099], in which it was held that a baseball player is bound by his contractual obligations "subject only to his right to retire from baseball." Here the petitioner is bound by the city rent ordi-

nance, but apparently not subject to his right to retire from the rental business.

The earliest modern instance of rent control was the wartime Emergency Price Control Act of 1942. Two years after its enactment, the United States Supreme Court held the act did not constitute a taking under the Fifth Amendment only because it provided that it shall not be construed "to require any person to sell any commodity or to offer any accommodations for rent." (*Bowles* v. *Willingham* (1944) 321 U.S. 503, 517 [88 L.Ed. 892, 905, 64 S.Ct. 641].)

Section 1803, subdivision (t) of the Santa Monica ordinance is in conflict with *Bowles,* in that the landlord is required to maintain his property as "accommodations for rent" and to offer the rentals under the terms ordered by the city. He is not permitted to opt out.

The city suggests that the property owner may avoid its draconian order by the forced sale of his property to another who would in turn be compelled to continue in the rental business. Assuming arguendo that such a person could be found—a doubtful assumption under these circumstances—the city's rationale leaves much to be desired. The city's theory is deceptively simple: "Once a landlord, always a landlord—or sell the property." The contention is, in effect, that the property owner has a duty to relieve the municipality of its invalid order by dispossessing himself of his property. Or to put it another way: persons who do not choose to abjectly submit to the city violating their fundamental rights should get out of town.

If the city forces this owner to involuntarily transfer his property to a third person, the result is no less a taking than if the municipality itself were to assume title to the property. Thus if the city insists upon its asserted public purpose of maintaining these six rental units ad infinitum, it must condemn the building and pay just compensation therefor. Neither the federal nor state Constitutions permit the city to achieve its purpose by impressing this owner and his property into the mold of a public utility bound in perpetuity to provide, maintain, and operate a housing business.

Contrary to the city's contention, cases involving historical landmarks are not relevant to the rights of a property owner of a strictly commercial structure that is of no known historical value.

The majority rely on *Fresh Pond Shopping Center* v. *Callahan* (1983) 464 U.S. 875 [78 L.Ed.2d 215, 104 S.Ct. 218], a case that has produced no prevailing written opinion at any level. The trial court published no opinion, the Supreme Court of Massachusetts summarily affirmed the judgment by a

tie vote (446 N.E.2d 1060), and the United States Supreme Court summarily dismissed a purported appeal for want of a substantial federal question. That scenario creates no persuasive, let alone binding, authority for anything.

The majority obtain the facts from the only opinion written in *Fresh Pond*: the dissent of Justice Rehnquist from the dismissal. But they ignore his conclusion: i.e., that he believes the rent control ordinance is the equivalent of "a physical occupation of the appellant's property," which, pursuant to *Loretto* v. *Teleprompter Manhattan CTAV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164], constitutes a taking without just compensation.

Since the Supreme Court majority declared there is no substantial federal question in *Fresh Pond,* we are free, as was Massachusetts in that case, to decide the present issue entirely on the basis of state authority. I am convinced that although petitioner has not asserted a taking by the city, the implications of California Constitution, article I, sections 1 and 19, cannot be avoided, and are controlling to prevent the arbitrary actions of the city herein. Also persuasive is *Department of Public Works* v. *San Diego* (1932) 122 Cal.App. 159, 169 [10 P.2d 102], in which an act was found to be within the city's police power, but its provisions "do not extend to the point where the owner . . . may be compelled to continue its operation or directly compelled to perform specific work which might be necessary to any such continuance."

The majority appear to adopt a simplistic view of the rental business, i.e., that it stems easily and inexorably from the ownership of property and involves a mere passive investment. Landlords undoubtedly wish that were so, but the realities of the economic world require them to perform numerous personal services and assume onerous obligations and serious potential liability. Indeed, under many circumstances that liability can be financially devastating. (See, e.g., *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324, 329-332 [176 Cal.Rptr. 494], and cases cited [landlord liable for rape that occurred on premises]; *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903 [162 Cal.Rptr. 194] [landlord liable for property damage suffered by tenant because of breach of warranty of habitability, and also liable for intentional infliction of emotional distress]; *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798 [142 Cal.Rptr. 787] [landlord liable for rape that occurred in plaintiff's apartment]; *Brennan* v. *Cockrell Investments Inc.* (1973) 35 Cal.App.3d 796 [111 Cal.Rptr. 122] [landlord must exercise ordinary care in management of premises, even those under tenant's control]; *Evans* v. *Thompson* (1977) 72 Cal.App.3d 978 [140 Cal.Rptr. 525] [landlord liable for property damage from fire]; *Golden* v. *Conway* (1976) 55 Cal.App.3d 948, 960 [128 Cal.Rptr. 69] [landlord strict-

ly liable for property damage when premises equipped with an appliance that proves to be defective]; *Uccello* v. *Laudenslayer* (1975) 44 Cal.App.3d 504 [118 Cal.Rptr. 741, 81 A.L.R.3d 628] [landlord liable for personal injuries received when tenant's dog bit an invitee of the tenant]; *People* v. *Greene* (1968) 264 Cal.App.2d 774 [70 Cal.Rptr. 818] [landlord subject to prosecution for nuisance for condition on property not of his own making].)

The foregoing cursory sampling of cases illustrates that being a landlord entails active and vigilant management. Thus when the city compels one to remain a landlord against his will, it is not merely freezing an investment, it is requiring him to perform constant personal services. Since 1865 involuntary personal service has been an anathema in a free society.

After relying on *Fresh Pond,* a case without a prevailing opinion, the majority seem to desperately seek some relevant authority; they therefore cite *Hawaii Housing Authority* v. *Midkiff* (1984) 467 U.S. 229 [81 L.Ed.2d 186, 104 S.Ct. 2321]. That Hawaiian landowners may have their property taken upon payment of just compensation is small comfort to this plaintiff who must remain a landlord under compulsion and perform the personal services imposed on landlords by case law, or in the alternative involuntarily dispose of his property to someone willing to undertake the required duties of a landlord. *Hawaii Housing Authority* does not purport to approve of such draconian conduct by a public agency.

I find the unanimous opinion of the Court of Appeal to be persuasive and therefore adopt the views of Presiding Justice Klein and Justices Lui and Danielson as my own. Their opinion follows in full, except that I omit their concluding discussion of the validity of other sections of the rent control law and attorney's fees:

The City of Santa Monica and the Santa Monica Rent Control Board (collectively Santa Monica) appeal the issuance of a writ of mandate ordering them to give Jerome J. Nash (Nash) a demolition permit. The writ was granted on the grounds that section 1803, subdivision (t) of the Santa Monica Rent Control Charter Amendment which rendered Nash ineligible for a demolition permit was unconstitutional.

Because the demolition permit requirement of section 1803, subdivision (t) in its application to the fact situation before us violates article I, section 7, subdivision (a) of the California Constitution, we affirm.

### FACTS AND PROCEDURAL HISTORY

In 1978, Nash purchased a six-unit apartment building which is the subject of this controversy. After operating the apartment for a time, Nash decided that he did not like being a landlord.

In 1979, the citizens of Santa Monica by initiative added article XVIII to the city's charter. This new article provided for a rent control board with the authority to set and adjust maximum rents and to control the removal of rental units from the housing market. (§ 1803.)[1] The rent control law also regulates tenant evictions. (§ 1806.) Section 1803 subdivision (t)[2] of the rent control law requires a landlord to obtain a permit before demolishing a building. Where the landlord both owns habitable property and does not wish to rebuild, a demolition permit will be granted only upon a finding that (1) the building is not occupied by persons of low or moderate income, (2) cannot be afforded by persons of low or moderate income, (3) removal will not adversely affect the housing supply and (4) owner cannot make a reasonable return on investment.

On or about December 3, 1979, Nash petitioned the rent control board for a demolition permit. Although required to do so by regulation, Nash did not concurrently file a petition for rent increase. He justified this omission on the grounds that he did not want to change the rents; he wanted to destroy the structure. The rent control board returned his petition for a demolition permit as incomplete.

Rather than complete the petition, Nash filed a petition for a writ of mandate with the trial court. After a hearing, the trial court determined that Nash had no adequate administrative avenue for obtaining the demolition permit as he could not comply with section 1803, subdivision (t). The trial court found that Nash was capable of making a fair return on his investment and that the building was affordable to and currently rented by persons of moderate or lower incomes.

---

[1] Unless otherwise indicated all section references are to Santa Monica City Charter, article XVIII.

[2] Section 1803, subdivision (t) provides as follows: "(t) REMOVAL OF CONTROLLED RENTAL UNIT FROM RENTAL HOUSING MARKET: Any landlord who desires to remove a controlled rental unit from the rental housing market by demolition, conversion or other means is required to obtain a permit from the Board prior to such removal from the rental housing market in accordance with the rules and regulations promulgated by the Board. In order to approve such a permit, the Board is required to make each of the following findings: [¶] (1) That the controlled rental unit is not occupied by a person or family of very low income, low income or moderate income. [¶] (2) That the rent of the controlled rental unit is not at a level affordable by a person or family of very low income, low income, or moderate income. [¶] (3) That the removal of the controlled rental unit will not adversely affect the supply of housing in the City of Santa Monica. [¶] (4) That the landlord cannot make a fair return on investment by retaining the controlled rental unit. [¶] Notwithstanding the foregoing provisions of this subsection, the Board may approve such a permit: [¶] (1) If the Board finds that the controlled rental unit is uninhabitable and is incapable of being made habitable in an economically feasible manner, or [¶] (2) if the permit is being sought so that the property may be developed with multifamily dwelling units and the permit applicant agrees as a condition of approval that the units will not be exempt from the provisions of this Article pursuant to Section 1801(c) and that at least fifteen (15) per cent of the controlled rental units to be built on the site will be at rents affordable by persons of low income."

Based on those findings, the trial court concluded as a matter of law that the rent control board's refusal to issue the demolition permit amounted to a deprivation of property without due process of law, and a taking for public use without just compensation. A peremptory writ of mandate was issued commanding the rent control board to issue Nash a removal permit. An appeal was timely filed on September 1, 1980.

## CONTENTIONS

On appeal, Santa Monica claims that the demolition restrictions are squarely within the ambit of the police power. Nash contends that the restrictions exceed the bounds of the police power by impermissibly impinging on his right to go out of the landlord business.

The issue[3] before this court is therefore whether section 1803, subdivision (t), insofar as it restricts the right of a landowner to go out of business by tearing down his building, violates the due process clause of the California Constitution. (Cal. Const., art. I, § 7, subd. (a).)

## DISCUSSION

### 1. *Standard of review is strict scrutiny.*

Generally, an exercise of the police power will withstand a substantive due process challenge so long as it is " 'reasonably related to a proper legislative goal.' " (*Perez* v. *City of San Bruno* (1980) 27 Cal.3d 875, 889 [168 Cal.Rptr. 114, 616 P.2d 1287]; *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].) In reviewing police power regulations, the court's role is usually very limited. "The wisdom of the legislation is not at issue [and] the availability of less drastic remedial alternative [will not] invalidate a statute." (*Ibid.*; see also *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 258-259 [49 Cal.Rptr. 537, 411 P.2d 289] (Mosk, J., dis.).)

However, where the rights affected by legislation are "so fundamental or 'implicit in the concept of ordered liberty' (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 325 . . .) as to require equivalent protection," a more searching level of scrutiny is applied. (*Perez* v. *City of San Bruno, supra,* 27 Cal.3d at pp. 889-890.) Our task therefore is to determine the nature of the rights involved here and the appropriate standard of review.

---

[3]Nash did not seek to defend the trial court's conclusion that section 1803, subdivision (t) constituted a compensable taking. Because of our resolution of the due process issue, we need not consider whether the resolution of the taking issue was correct.

Under section 1803 subdivision (t) as long as the structure is habitable and low or moderate income people can afford the apartments, the owner cannot get a permit to withdraw the rental units from the market. A landlord cannot terminate his business[4] by evicting all the tenants and letting the building stand empty, since evictions are carefully regulated. (See § 1806.) Additionally, because conversion permits are available only under the same conditions as demolition permits, an owner cannot cease being a landlord by selling the units as condominiums.[5] The only possible way out is to sell to someone who is willing to be a landlord. To do so, however, may cause substantial financial hardship if the value of the property has dropped as a result of rent control. A landowner who wishes to keep the land is therefore compelled to stay in the residential rental housing business. Thus, the rent control law impinges upon the individual's right to go out of business.

Having demonstrated that the right involved is the right to go out of business, we must now determine whether infringements of that right are subject to strict scrutiny. The resolution of this issue turns on the nature of the right.

The right to cease operating a business has not been widely discussed, hence its contours and boundaries are not clear. We do not purport here to define fully the extent of the right to go out of business, since its very core is infringed upon by the statute before us. Generally speaking, it is the right of the individual to stop working in a given occupation or the operation of a given business.[6] Although the right does not restrict the state's power to regulate the conduct of a business voluntarily engaged in, it restricts the government's ability to force the individual to participate in a particular enterprise. Because it touches the individual's ability to make a choice which greatly affects his or her life style, the right to go out of business is a personal freedom. Its title, which makes it sound like an economic right, is therefore deceptive.

The group of rights protected by strict judicial scrutiny is not limited to rights expressly set forth in the Constitution, but "extends to basic values 'implicit in the concept of ordered liberty.' [Citation.]" (*City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 266 [85 Cal.Rptr. 1, 466 P.2d 225,

---

[4]Neither party disputes that renting housing is a business. (See *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 731 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].)

[5]In addition to the regular permitting requirement, Santa Monica has recently instituted a temporary moratorium on condominium conversion, thereby completely eliminating conversion as a method of going out of business. (See Housing Element, Santa Monica Master Plan, Program 25.)

[6]We note that the right to go out of business does not apply to public utilities, which hold a special place both in relation to the public welfare and in the law. (See Cal. Const., art. XII, § 3.)

37 A.L.R.3d 1313]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 767 [135 Cal.Rptr. 345, 557 P.2d 929].) Therefore, that the right to go out of business is neither an express nor a widely acknowledged right does not bar the application of strict scrutiny.

There exists an undefined yet real notion of freedom which is violated by the idea of compelling an individual to work in a given business. This freedom is protected from the most egregious infringements by the Thirteenth Amendment of the United States Constitution. Yet the degree to which the individual is restricted need not rise to the level of involuntary servitude before it offends this notion of personal liberty. For example, employment contracts for personal services are not specifically enforceable against either the employee or the employer. (Civ. Code, § 3390; see also § 3423, subd. Fifth.)

Indeed, California courts have even been reluctant to force landowners to use property in a specified manner. In *Dept. of Public Works* v. *San Diego* (1932) 122 Cal.App. 159, 166-167 [10 P.2d 102], the court stated: "While the police power may limit and restrict the uses to which an owner may put his property, it may not compel him to use such property for a particular purpose if he prefers to abandon such a use thereof." The right to cease to operate a business, impacting as it does on the work efforts of the proprietor, is one aspect of this more general freedom.

The right of an individual not to work in a certain occupation is closely analogous to the " 'right to work for a living in the common occupations of the community.' " (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 576 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) Deemed "essential to the pursuit of life, liberty and happiness," the right to work in a common occupation is protected from unjustified interference by strict scrutiny review. (*Sail'er Inn, Inc.* v. *Kirby, supra*, 5 Cal.3d at p. 17; but cf. *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18 [112 Cal.Rptr. 786, 520 P.2d 10] [right to work in technical or complex field not protected by strict scrutiny].)

Like the right to enter an occupation, the right to terminate a business involves a personal decision concerning the individual's role in the economy. Both protect the individual's ability to use his or her talents and resources in the manner best suited to bring life satisfaction and economic security.

Given the close relationship between the right to go out of business and other rights which are fundamental, the rational basis standard of review

seems improper. Accordingly, we shall use heightened scrutiny in evaluating laws which infringe upon the right to go out of business.

In their supplemental brief Santa Monica contends that even if the right to go out of business is fundamental, section 1803, subdivision (t) should not be analyzed under strict scrutiny. They argue section 1803, subdivision (t) is just a land use regulation subject to rational basis scrutiny and that any infringement on the right is merely incidental. In support of this argument, Santa Monica cites *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 537 P.2d 473, 92 A.L.R.3d 1038]. That case however is clearly distinguishable. In *Associated Home Builders* the court refused to apply strict scrutiny to an exclusionary zoning ordinance despite appellants' claim that the right to travel was involved. In reaching this conclusion the court noted that the ordinance did not penalize the right to travel, but rather only made its exercise more difficult. (*Id.*, at p. 603.)

Here section 1803, subdivision (t) does not just make it hard for a property owner simultaneously to keep his land yet cease being a landlord, it makes it impossible. Therefore, although it appears on the surface that section 1803, subdivision (t) is a purely economic regulation, it fundamentally affects a personal right and strict scrutiny must be applied.

2. *Section 1803, subdivision (t) fails to meet the strict scrutiny test.*

"When rights of such fundamental nature are involved, 'regulations limiting these rights may be justified only by a "compelling state interest," [citations] and . . . legislative enactments must be narrowly drawn to express only the legitimate state interests at stake.'" (*Perez* v. *City of San Bruno, supra,* 27 Cal.3d 875 at p. 890, fn. 11.) Assuming arguendo that Santa Monica's interest in preserving the stock of rental housing is compelling, we must decide whether the statute is drawn closely enough to pass constitutional muster.

A nonexhaustive survey of other rent control acts reveals that the Santa Monica act imposes the greatest limits on a landowner's ability to go out of the rental business. Most liberal was the federal rent control act enacted during World War II, and even this wartime measure provided that "[n]othing in this Act shall be construed to require any person to sell any commodity or to offer any accommodations for rent." (Emergency Price Control Act of 1942, as quoted in *Bowles* v. *Willingham* (1944) 321 U.S. 503, 517 [88 L.Ed. 892, 905, 64 S.Ct. 641].)

Several jurisdictions expressly permit tenant evictions to facilitate demolitions. (1970 Mass. Acts, ch. 842, § 9(a) 9; 1969 Mass. Acts, ch. 797 [rent

and eviction controls for Boston, Mass.]; Berkeley, Cal. city ordinance, Stats. 1972 (Reg. Sess.) res. ch. 96, p. 3372, declared unconstitutional on other grounds, *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001].)

Only the New York Emergency Housing Rent Control Act (N.Y. Unconsol. Laws, § 8581 et seq.) comes close to the Santa Monica law. It requires rental commission approval before a unit can be withdrawn from the market where such withdrawal involves the eviction of a tenant. (N.Y. Unconsol. Laws, § 8590(4).) However, under the New York law, a landlord could demolish a building if it is to be replaced with a nonresidential structure, which is not true in Santa Monica. (N.Y. Unconsol. Laws, § 8585, subd. 2(d)(ii); cf. Housing Element, Santa Monica Master Plan, Program 10.)

These other laws demonstrate that it is possible to pursue the goals of avoiding the depletion of the housing stock and preventing upward pressure on rents without forcing a landowner to be in the residential housing business against his/her will.

The Santa Monica law may be marginally more effective than those of other jurisdictions. Realistically, however, few landowners will prefer to see their land lying fallow instead of producing income; thus, the practical effect of such strong removal restrictions on the housing stock is probably minimal.

Additionally, we note that the vacancy rate in surrounding communities is higher than in Santa Monica.[7] Therefore, a fractional decrease in Santa Monica's housing stock should not have a strong adverse effect on the public as alternative accommodations are available. While Santa Monica has the right to preserve housing regardless of what occurs in neighboring jurisdictions, greater housing opportunities in the surrounding areas make the Santa Monica controls less "compelling." On the other hand, the incursion on the right to go out of business is strong.

The state has the burden of demonstrating the necessity of regulations that infringe on fundamental interests. (*Subriar* v. *City of Bakersfield* (1976) 59 Cal.App.3d 175, 199-200 [130 Cal.Rptr. 853].) Here there has been an insufficient showing of such a necessity that the benefits received outweigh the strong burden on a personal freedom.

---

[7]The vacancy rate in early 1981 in West Los Angeles was 2.12 percent. (City of Los Angeles Housing Statistics, Dept. of City Planning.) The vacancy rate in Santa Monica using 1980 census data was 1.7 percent. (Technical Rep. to Housing Element, p. 165.)

We take judicial notice of statistics from the department of city planning pursuant to Evidence Code section 452, subdivision (h).

Santa Monica may be concerned that less stringent regulation of removals would permit the circumvention of the rent control law by allowing landlords to demolish their buildings and then replace them with newly constructed units which are not subject to rent control. While this concern is legitimate, (see discussion in *Flynn* v. *City of Cambridge* (1981) 383 Mass. 152 [418 N.E.2d 335, 339, 21 A.L.R.4th 1075]), less intrusive means may be found for achieving it. Santa Monica could make new construction on lots formerly containing rent controlled property subject to rent control.

Because the demolition permit requirement of section 1803, subdivision (t) infringes more than is necessary in this limited fact situation for the effectuation of its goals, it violates the due process clause of article I, section 7, subdivision (a). We do not hold that all demolition controls are constitutionally infirm. We find only that the current Santa Monica ordinance is too restrictive to pass constitutional muster. [End of Court of Appeal opinion.][8]

I would affirm the judgment.

Crosby, J.,* concurred.

---

[8]The commendable solicitude of the City of Santa Monica for tenants apparently does not apply when the city itself is a landlord. (See, e.g., *Harmon* v. *Superior Court,* City of Santa Monica Real Party in Interest, 2 Civ. B003391.)

*Assigned by the Chairperson of the Judicial Council.