Margaret **KINZLI**, Evelyn Goossen, Philip Kinzli and Ernest Kinzli, Plaintiffs,

v.

**CITY OF SANTA CRUZ, Defendant.**

**No. C–80–2863–MHP.**

United States District Court,
N.D. California.

Oct. 29, 1985.

Jess S. Jackson, Jackson, Jacobsen & Banke, San Francisco, Cal., for plaintiffs.

Neal R. Anderson, Gerald D. Bowden, Atchison, Anderson & Daley, Santa Cruz, Cal., for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM DECISION

PATEL, District Judge.

Plaintiffs have instituted this action on a variety of theories and jurisdictional grounds. The gravamen of the particular claims submitted to the court for trial at this stage of the proceedings is that the adoption of Measure O deprives them of their property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. A claim for damages and other relief is made pursuant to 42 U.S.C. § 1983. Plaintiffs have also alleged violations under §§ 1985 and 1986 of Title 42. A pendent state claim for inverse condemnation is grounded on the same facts.

The matter was tried to the court on two issues: whether the controversy is ripe for adjudication and, if so, whether there has been a taking of plaintiffs' property.

## FINDINGS OF FACT

### I. *Background*

#### A. *The Kinzli Property*

Plaintiffs are a widow and her three children. The property which is the subject of this action has been in the family since 1925 when the total parcel of 74.9 acres was purchased for $25,000. From 1925 to 1944 the family operated a dairy on the property. The property was leased as a dairy from 1944 to the early 1960's. Since that time the family has held the property as an investment and used it for cattle grazing.

During the early 1970s the City of Santa Cruz ("City") grew. Gradually the Kinzli property, which retains its rural character, has become surrounded by urban development.

Portions of the property have previously been acquired by the City and the Santa Cruz Port District. Another portion lies outside the City limits.

In 1968, the City filed a condemnation action in state court to acquire approximately 4 acres of the property for construction of a public street. The street was never constructed and that is the subject of another part of this action not discussed here. As a result of the condemnation action plaintiffs currently hold two parcels totalling 62 acres with a City-owned right-of-way between them.

An application for a lot split for 2½ acres was approved by the City in 1979 subject to certain conditions, including one requiring removal of advertising signs which provide a total income of approximately $100 to $150 per year. The application was submitted to the Regional Coastal Zone Conservation Commission and subsequently withdrawn by the Kinzlis.

The property is and has for a substantial period of time been zoned primarily R–1–5, which permits single-family residences with a minimum lot size of 5,000 sq. ft. A small portion of the property is zoned commercial and another small portion is zoned flood plain. The property is served with water, sewer and other utilities.

From at least 1970 when a stipulated judgment was entered in condemnation proceedings, the City represented to plaintiffs that a thoroughfare would be built joining

an existing street on the west side of the property with an existing street on the east side of the property. This would of course substantially benefit the property by providing greater access. In addition, plaintiffs were assured by the City that development of the property would be permitted for commercial purposes and for residential purposes at a greater density. The Kinzlis delayed sale or development in reliance on these proposals and, indeed, it appears that the proposals continued to remain viable in some form until at least October 1978, since the City filed another condemnation action to acquire an additional piece of plaintiffs' property for modification of the right-of-way. The second condemnation action was abandoned. The property in question now consists of 62 acres situated on the eastern border of the City.[1] It is bounded on the south by the Santa Cruz harbor, on the north by Capitola Road, on the west by Agnes Street and on the east by the City limits.

The upper portion of the property is relatively level consisting of a grassy plain with virtually no trees. The lower portion dips toward a wetlands area and overlooks the upper yacht harbor. A natural drainage course, Arana Gulch, borders one side; another gulch lies along the western boundary. The only structures on the property are an old house in need of repair and a barn.

There are several constraints on the property or portions of it, including flood plains, liquefaction potential during seismic activity and possible landscape effects on the western slope.

For at least the last five years the property has not produced a profit. The taxes are approximately $5,360 per annum. The gross income for at least the last five years has not exceeded the property taxes.

B. *The Adoption of Measure O*

On March 6, 1979 the voters of the City adopted an initiative ordinance entitled "City of Santa Cruz Measure O Greenbelt and Low Growth General Plan Policy Ordinance" ("Measure O"). Subsequently the Santa Cruz City Council enacted two ordinances implementing Measure O: 1) Ordinance No. 79–9 adopted March 13, 1979 and commonly referred to as the Moratorium Ordinance; and 2) Ordinance No. 80–02 adopted January 22, 1980, effective February 21, 1980 and commonly known as the Greenbelt Overlay Ordinance.[2]

The announced purpose of Measure O is to require revisions of the General Plan in order to limit City growth and to preserve certain lands described as greenbelt land. The Kinzli property falls within the greenbelt as described in Measure O. The remaining property subject to Measure O forms a ridge or belt along the north and northwest City limits of Santa Cruz. The Kinzli property is the only greenbelt property completely surrounded by urban development.

Measure O limits the uses to which greenbelt land can be put through the year 1990. Sec. 3 of the Measure provides for the following uses:

1) Timber production and harvesting
2) Agriculture, including grazing
3) Private recreation
4) Public recreation
5) Wildlife habitat
6) Watershed or groundwater recharge
7) Scientific or educational purposes which maintain the open space character of the land
8) Other uses which maintain the open space character of the land.

In addition, Sec. 4 of the Measure prohibits the City from providing to these lands addi-

---

1. This acreage represents the total of the two parcels less small portions previously sold off by the Kinzlis, the segment taken by condemnation and that portion located outside the City limits.

2. Another ordinance, Ord. 79–45, was apparently adopted effective December 18, 1979. It, along with Ord. 80–02, was codified at Ch. 24.53 of the Santa Cruz Municipal Code. The latter ordinance appears to be a reenactment of Ord. 79–45. It is the codified version that is at issue here.

tional urban services, including water, sewer and roads.

Apparently in an attempt to foreclose any modification of the initiative by City officials, Measure O also provides that no part of it "shall be amended or repealed except by a vote of the people." (Sec. 8) The Measure then goes on to require the City to revise the General Plan in accordance with the Measure within nine months of its effective date. (Sec. 5)

The City Council adopted a Moratorium Ordinance in order to comply with the Measure. That Ordinance proscribed the issuance of permits to build on the greenbelt lands for a period of nine months or until the City Council adopted a revision to the General Plan.

Approximately nine months later the Council adopted the Greenbelt Overlay Ordinance ("GBO"). Santa Cruz Municipal Code ch. 24.53, § 24.53.2000 (1981). Restating the provisions of Measure O, the Greenbelt Overlay allows the following uses of greenbelt lands upon the obtaining of a special use permit:

> Timber production and harvesting
>
> Agriculture, including grazing
>
> Private recreation uses
>
> Public recreation uses
>
> Scientific or educational uses which maintain the open space character of the land
>
> Single-family dwellings
>
> Accessory buildings
>
> Other uses which maintain the open space character of the land.

*Id.* § 24.53.2010. The Ordinance then provides that any other use "may be allowed by special use permit" if it is of the same general character as the uses enumerated and if it conforms to the purpose and intent of the Ordinance. Uses are required to be both "environmentally and visually compatible with the existing physical characteristics of the land, and permitted uses cannot have potential for significant effect on the environment in accordance with the definition contained in the California Environmental Quality Act (CEQA)." The Green-

belt Ordinance allows extension of urban services in the Overlay area only upon a finding that the use is consistent with the Ordinance and subject to the approval of the City Department of Water and Department of Public Works. *Id.* § 24.53.2040.

The City has acknowledged that prior to Measure O the property would probably have been developed as multi-family residential with the harbor side developed as visitor-commercial. Under the General Plan adopted in 1964 the property was designated for high density development. In subsequent years the City, like other municipalities, struggled to develop plans to meet growing urban demands and community preservation.

## C. *The Effect of Measure O on the Kinzli Property*

The Kinzlis made their first serious attempt to sell the property in 1978. Conditional contracts of sale were entered into with potential buyers in 1978 and 1979 subject to receiving the necessary permits for development of a minimum of 250 residential units. The offer in 1978 was $2,137,500; the offer in 1979 was $2,300,000. Also in the summer and fall of 1978 a greenbelt ordinance began to be discussed publicly. It culminated in the passage of Measure O in March 1979.

The Kinzlis themselves never made application for a permit for any uses under Measure O. They are not financially or otherwise able to engage in any substantial development of the property. A potential purchaser/developer pursuant to a conditional purchase agreement completed and filed an application on behalf of the Kinzlis. The proposal was for approximately 300 units. In response to an inquiry whether water and sewer services were available for the development, a staff engineer of the Department of Public Works responded that the City could not provide water services. An unofficial map in use by the Department at that time bore the legend "No services to this area."

The developer did not pursue the inquiry further. He made no attempt to meet or

confer with any higher ranking personnel of the Department. He did not contact the Director of Public Works in order to get some relief from the restriction.

Ordinarily the permit process for a development requires negotiation and modification of plans over a period of time in order to obtain the necessary permits. A variety of state and local requirements must be met. Governmental agencies must consider the impact of the additional services, the zoning restrictions and any variances, environmental and other constraints, to name only a few.

Other permit or administrative approvals may also be required from transportation agencies, the California Coastal Commission and other state and local agencies. In addition, an Environmental Impact Report must be provided.

None of these processes was pursued. Ultimately the application was withdrawn because the developer concluded that processing would never be completed because of Measure O.

The City maintains that as a result of the adoption of the GBO there are purposes for which a permit could be issued. The GBO added to the specific uses of Measure O single family dwellings, accessory buildings and other uses which maintain the open space character of the land. In addition, urban services may be extended if consistent with the GBO.

It is clear that a development of the size and type contemplated by plaintiffs in connection with the 1978 and 1979 proposals is not permitted under Measure O and the GBO. It has been stipulated by the parties that the property is not suitable for certain of the uses allowed under the Measure including timber production and harvesting, wildlife habitation or watershed purposes. Nor is it seriously argued that there are any viable scientific or educational uses to which the property may be put.

Plaintiffs maintain there are no permitted uses under Measure O as implemented by the GBO that leave a viable economic use for the property; that because of Measure O urban services may not be extended; that any further application is futile; and, therefore, there has been a "taking" without just compensation.

Defendant attempts to rebut by showing that the property can be used for agricultural or recreational purposes for which a permit could be obtained. Among the uses proffered are a restaurant, recreational vehicle park, strawberry cultivation and greenhouses for the growing of roses or carnations.

A restaurant is neither economically viable nor a likely permissible use. There is inadequate access to the property without additional roads, which are forbidden under Measure O. Furthermore, the underlying zoning does not allow for commercial uses such as a restaurant.

A recreational vehicle park is wholly inconsistent with the character of the area and with the intent of Measure O. Some additional structures would be necessary in order to service the park. Extension of services would also be required. The City maintains the park could be sensitively screened by the planting of trees. However, this will not change the fact that transient recreational vehicles in a variety of sizes, cars with trailers and other types of mobile camping equipment would be regularly traversing residential City streets and encamped in an essentially residential area.

Nor is a recreational vehicle park an economically feasible use of the property. There are other properties in the area more suitable for rental or purchase for a recreational vehicle park. The Kinzli property is not a comparable or choice location because it is situated within the City limits. None of the other recreational parks cited in defendant's demonstration are located in an urban area. The City of Santa Cruz has never approved a recreational vehicle park within the City limits. The structures, roads and other capital expenditures necessary to the development of a recreational vehicle park would be substantial and disproportionate to the temporary period for which they would be in use in light of the

expiration date of Measure O. Even assuming a high occupancy rate and the maximum number of units the City projects as permissible under Measure O, the park would not provide a sufficient return to be economically viable.

The agricultural uses suggested by the City are also not economically feasible. Only a small portion of the property, approximately 15 acres, could be used for strawberry cultivation. The rental rate necessary to obtain a return is not competitive enough to attract possible lessees. There are other properties available at lower rental rates in more suitable rural areas. The type of soil and the poor drainage do not make the property as attractive to a strawberry farmer as other properties in the area. Moreover, the use of pesticides presents serious hazards in an urban area.

Greenhouses are also not economically feasible. An urban site is not likely to attract potential greenhouse growers. There is a danger in runoff of soil additives or pesticides. Structures, including service buildings and the greenhouses themselves, would be necessary. Additional urban services, particularly water, would be needed. Even the City's expert admits that a prospective grower would look elsewhere for rental for greenhouse purposes. There are other more suitable locations with better land values and long-term lease prospects.

Again, the underlying zoning would proscribe greenhouses in an R–1–5 area.

The market value of the property subject to Measure O is approximately $550,000. Upon the expiration of Measure O the value may increase to as high as 7 million.

## CONCLUSIONS OF LAW

This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 to redress grievances under the Civil Rights Acts contained in Title 42 U.S.C. at §§ 1983, 1984 and 1986 and under the Fifth Amendment of the United States Constitution. Jurisdiction over the state claim is also proper. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### A. *The Procedure of "Taking"*

The taking clause of the Fifth Amendment provides that private property shall not "be taken for public use without just compensation." The clause applies to the states through the Fourteenth Amendment. *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

 Section 1983 is an appropriate vehicle for seeking monetary and other relief for a deprivation of property without due process or for a taking under the Fifth Amendment.[3] *See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,*

---

**3.** The question of appropriate relief for a taking is not wholly settled under federal law. The closest the Supreme Court has come to dealing with the issue is in Justice Brennan's dissent in *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981). In that case the majority held there was no final order from which an appeal could be taken and, therefore, never reached the relief issue. Justice Brennan, writing for four of the justices, would have reached the merits. On one issue he spoke for the majority, Justice Rehnquist concurring:

> [O]nce a court establishes that there was a regulatory 'taking,' the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation.

*Id.* at 653, 101 S.Ct. at 1305. Other courts have similarly interpreted this as the view of the Supreme Court. *See Martino v. Santa Clara Valley Water District*, 703 F.2d 1141 (9th Cir.), *cert. denied*, 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983); *Hamilton Bank v. Williamson City Regional Planning Comm.*, 729 F.2d 402, 407 (6th Cir.1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 80, 83 L.Ed.2d 28 (1984).

On the other hand, the California Supreme Court has made it clear that the appropriate remedy under state law for an unconstitutional regulation that operates as a taking is mandamus or declaratory relief rather than inverse condemnation resulting in monetary damages. *Agins v. City of Tiburon*, 24 Cal.3d 266, 275–77 (1979), *aff'd*. 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Martino v. Santa Clara Valley Water District*, 703 F.2d 1141 (9th Cir.), *cert. denied*, 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983); *C–Y Development Co. v. City of Redlands*, 703 F.2d 375 (9th Cir.1983); *Pamel Corp. v. Puerto Rico Highway Authority*, 621 F.2d 33 (1st Cir. 1980).

It is well established that governmental regulation affecting an owner's use of his property may constitute a taking even though there is no actual physical occupation of the property. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). *See also Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979); *Goldblatt v. Hempstead*, 369 U.S. 590, 593–94, 82 S.Ct. 987, 989–90, 8 L.Ed.2d 130 (1962).

The Supreme Court has stated that a zoning regulation

> effects a taking if the ordinance does not substantially advance legitimate state interests, *see Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928) or denies an owner economically viable use of his land, *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 [n. 36], 57 L.Ed.2d 631 (1978).

*Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

There is no dispute that open space ordinances of the type in question here substantially advance legitimate state interests. Provision for open space has been made in California state statutes and cities and counties are mandated to adopt open space zoning ordinances. Cal.Gov't.Code § 65910. The preservation and conservation of open space areas for the protection of resources, recreational and public safety purposes, management of growth and oth-

er uses in the public interest is well-recognized. "The [United States] Supreme Court has accepted regulatory purposes that impose restrictive land use burdens, has refused to entertain facial attacks on land use regulations, and has indicated that even harsh land use restrictions can be justified by widely distributed community benefits." Mandelker, *Land Use Takings: The Compensation Issue*, Hastings Const. L.Q. 491, 503 and n. 38 (1981). *See also Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386–87, 47 S.Ct. 114, 117–18, 71 L.Ed. 303 (1926); *Eldridge v. City of Palo Alto*, 57 Cal.App.3d 613, 629–30, 129 Cal.Rptr. 575 (1976).

### 1. *Ripeness*

■ Plaintiffs do not challenge Measure O as facially invalid or as an arbitrary use of the City's police power; rather they challenge the Measure on the grounds that *as applied* to their property it deprives them of an economically viable use. It is clear under *Agins* that in order to launch an "as applied" challenge the owner must show he has submitted a development plan or applied for a permit. *Cf. Martino v. Santa Clara Valley Water District*, 703 F.2d at 1146–47. California courts and some federal courts have characterized this requirement as an exhaustion of administrative remedies. *Frisco Land & Mining Co. v. California*, 74 Cal.App.3d 736, 744, 754–56, 141 Cal.Rptr. 820 (1977), *cert. denied*, 436 U.S. 918, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978); *Urbanizadora Versalles, Inc. v. Rivera Rios*, 701 F.2d 993 (1st Cir.1983).[4] This court previously described it in terms of ripeness, *Kinzli v. City of Santa Cruz*, 539 F.Supp. 887 (N.D. Cal.1982), and the Ninth Circuit appears to view it similarly. *Martino*, 703 F.2d at 1146 n. 2.

---

**4.** This court respectfully declines to follow the statement in *Urbanizadora Versalles* that where the action is brought under § 1983 there is no exhaustion requirement. 701 F.2d at 999 (relying on *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)). To interpret § 1983 in this manner would entirely

vitiate the rule the Supreme Court laid down in *Agins* that there must be an actual application of the challenged regulation by the submission of a plan for development. *Agins* described this condition in terms of whether there was a "concrete controversy."

## 2. *Futility*

■ Whatever the characterization, the failure to present a development plan or make other appropriate application is fatal to an "as applied" challenge, unless plaintiffs can show that an application would be futile. *See Dahl v. City of Palo Alto,* 372 F.Supp. 647 (N.D.Cal.1974) (cited approvingly in *Martino,* 703 F.2d at 1146 n. 2). The ripeness doctrine does not require a party to go through useless, idle acts before coming into court to challenge the offending regulation.[5]

Whether the controversy is ripe under *Agins* or whether plaintiffs should be excused on futility grounds can only be decided in the larger context of what uses remain. If there appear to be viable permissible uses under the Ordinance, plaintiffs must submit a development plan or application. If, however, the Ordinance deprives plaintiffs of any beneficial use, they should not be compelled to pursue futile procedures.

## B. *The Concept of "Taking"*

The Supreme Court has long recognized that the concept of taking is not readily susceptible to definition. As early as *Pennsylvania Coal Co. v. Mahon,* the Court observed that it "is a question of degree—and therefore cannot be disposed of by general propositions." The only guidance finally offered was that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415, 43 S.Ct. at 160.

In its most recent pronouncement the Supreme Court reiterated its reluctance to lay down any firm guidelines, "as has been admitted on numerous occasions, 'this court has generally been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action' must be

deemed a compensable taking." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). The most thorough discussion of what constitutes a taking is contained in *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659 (1978), which described the analysis as essentially an "ad hoc, factual" inquiry.

■ Certain principles emerge from *Penn Central.* Takings are more readily found when there is an actual physical invasion than when there is merely a restriction of use because of a regulation for the welfare of the general public. Takings are more readily found when an existing use is impaired. However, the considerations are not as weighty when it is merely the ability to exploit an interest not already put to use that is affected.

■ The factors to be considered in the "ad hoc, factual inquiry" under *Penn Central* are the nature of the governmental action and the economic effect of the regulation upon the landowner.

■ The governmental action exercised under Measure O is not only an appropriate exercise of police power, but also is within the purview of the state mandate for open-space planning. In addition, the governmental action does not result in a permanent restriction. It is temporary, although for a lengthy period of time. The constraint, of course, is not as harsh as a permanent restriction. However, even though temporary, it may constitute a taking. The inquiry is whether the owner's property rights are substantially interfered with or whether he alone has been forced to assume more than his fair share of the public burden. *See Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 82–83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949); *United States v. Petty Motor Co.,* 327 U.S. 372, 377–78, 66 S.Ct. 596,

---

5. California cases, speaking in terms of exhaustion of administrative remedies, are in agreement. If the property owner can establish that pursuit of an application would have been futile, he will not be compelled to exhaust. *See*

*also Tilem v. City of Los Angeles,* 142 Cal.App.3d 694, 704, 191 Cal.Rptr. 229 (1983); *Taper v. City of Long Beach,* 129 Cal.App.3d 590, 614–15, 181 Cal.Rptr. 169 (1982).

599–600, 90 L.Ed. 729 (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 379–80, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945).

The Sixth Circuit has determined that temporary impairments "should be analyzed according to the same framework applied to permanent irreversible 'takings.'" *Hamilton Bank v. Williamson City Regional Planning Comm.*, 729 F.2d 402, 407 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 80, 83 L.Ed.2d 28 (1984) (quoting *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 657, 101 S.Ct. 1287, 1306, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting)). However, the Supreme Court in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3171 (1982) suggests that when temporary and permanent invasions or restrictions are placed against the same framework there is not an exact fit. "More recent cases confirm the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property." *Id.* at 430, 102 S.Ct. at 3173.

Thus, the court must look to all of the considerations laid out in *Penn Central*, including the length of the intrusion or impairment, in determining whether it amounts to a taking.

The rights implicated in a temporary impairment are less immutable than those involved in an actual physical occupation of the property where the owner "entertains a historically rooted expectation of compensation." *Loretto*, 458 U.S. at 441, 102 S.Ct. at 3179. Taking by regulation, where the owner is not ousted from the property or suffers no physical intrusion, depends on a less defined standard. It is, however, "not standardless." *Id.* at 426, 102 S.Ct. at 3171. It requires a balancing of the nature of the governmental action, the extent of the intrusion and the owner's interest in an economically viable use of the property.

It is thus necessary whether reviewing temporary or permanent takings to look at the economic effect upon the plaintiffs.

*Penn Central* describes this aspect of the inquiry as whether the owner is left with a viable economic use of the property.

1. *Viable Economic Use*

■ Deprivation of the highest and best use of property does not constitute a taking. *Penn Central*, 438 U.S. at 127, 130, 98 S.Ct. at 2660, 2662. Nor is mere diminution of the market value of the property a taking. *Id.* at 124–25, 131, 98 S.Ct. at 2659, 2662; *Euclid v. Ambler Realty Co.*, 272 U.S. at 365, 47 S.Ct. at 114.

Even where the value of the property has been diminished by as much as 87½% the Supreme Court has found no taking. *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915). *See also Euclid v. Ambler Realty Co.*, 272 U.S. at 389, 47 S.Ct. at 118 (75% diminution in value). In *William C. Haas v. City & County of San Francisco*, 605 F.2d 1117 (9th Cir.1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980), this Circuit made it clear that even a significant diminution in and of itself does not render the regulation a taking. This is true although the owner has suffered a substantial and disproportionate share of the regulatory burden. In *Haas* a diminution from $2,000,000 to $100,000 was found not to be a taking. The question, the *Haas* court noted, focuses "on the uses the regulations permit." *Id.* at 1120 (quoting *Penn Central Transportation Co. v. New York City*, 438 U.S. at 131, 98 S.Ct. at 2662).

■ So too, loss of anticipated gains or profits is not sufficient to constitute a taking. *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327 (1979).

The term "economically viable use" is as elusive a concept as the taking. The most comprehensive discussion of the term by the Supreme Court appears in *Penn Central*. The term has been defined in these proceedings by appraisers and economists as a use providing a return to land and investment or providing a net income. This is not necessarily the definition accepted by

the courts for the purposes of determining whether there has been a taking.

Courts have referred to the denial of an economically viable use as requiring a substantial interference with the use of the property. Others have looked at it in terms of "whether the restriction on private property 'forc[es] some people alone to bear public burdens which, in all fairness, should be borne by the public as a whole.'" *Pruneyard Shopping Center v. Robins,* 447 U.S. at 83, 100 S.Ct. at 2041; *see also Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979).

 One test that recurs throughout recent taking jurisprudence is whether the regulation interferes with "reasonable investment-backed expectations." This characterization was first used in *Penn Central.* It was illuminated along with other considerations that inform the ad hoc, factual inquiry required when governmental regulations restrict the use of property. The *Penn Central* court defined the test in terms of what it is not. It is not the denial of "the ability to exploit a property interest that they [the owners] heretofore had believed was available for development." *Id.* at 130, 98 S.Ct. at 2662. It does not look at the property in segments or parcels, but rather at the effect upon the whole. It is not merely the diminution in value of the property, even if that diminution is substantial.

A reasonable investment-backed expectation must be just that. The owner must have some investment at stake made in contemplation of a purpose or use based upon a reasonable expectation. There are sound reasons for this requirement. "[C]ompensation need not be paid in respect of investments which, when they were made ... were of a sort which society had adequately made known should not become the object of expectations of continuing enjoyment." Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165, 1240 (1967). Also, the expectation "must be

more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.,* 104 S.Ct. at 2875 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980)). The facts of *Monsanto* have little relevance to this case. However, the court did shed light on what is meant by an investment-backed expectation. Monsanto Company contended that provisions for the consideration and disclosure of data submitted to the Environmental Protection Agency pursuant to the Federal Insecticide, Fungicide and Rodenticide Act effected a "taking" of trade secrets property. Insofar as pertinent here the court found that when certain data was submitted by Monsanto the company was on notice of its ultimate disclosure. Nevertheless Monsanto submitted the data in order to obtain a registration for certain products. Being aware of the conditions under which the data was submitted, Monsanto "can hardly argue that its reasonable investment-backed expectations are disturbed when EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission." *Id.*

During this same term the court described the kind of impairments suffered under regulatory restrictions on property that may amount to a taking. The language is striking and suggests the extent of the showing necessary: "a *radical* curtailment of a landowner's freedom to make use of or ability to derive income from his land"; a *severe* interference with "distinct investment-backed expectations" (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). However, "even a *substantial* reduction of the attractiveness of the property to potential purchasers" does not constitute a taking. *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 2196–97, 81 L.Ed.2d 1 (1984) (emphasis added).

### 2. *Applicable California Law*

California cases do not provide a different standard. They have held that there is

no vested right in existing or anticipated zoning or land uses. *HFH, Ltd. v. Superior Court,* 15 Cal.3d 508, 516, 125 Cal.Rptr. 365, 542 P.2d 237 (1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). There is no taking where the owner has failed to establish that the land is not saleable, but merely that the market value was diminished. *Eldridge v. City of Palo Alto,* 57 Cal.App.3d at 624, 129 Cal. Rptr. 575. Only where the "effect is to deprive the landowner of substantially all reasonable use of his property" will a taking be found. *Rancho La Costa v. County of San Diego,* 111 Cal.App.3d 54, 65, 168 Cal.Rptr. 491 (1980), *cert. denied,* 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981). *See also North Sacramento Land Co. v. City of Sacramento,* 140 Cal.App.3d 576, 189 Cal.Rptr. 739 (1983); *Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 103 Cal.Rptr. 799, 514 P.2d 111 (1973).

In the two most recent opportunities the California Supreme Court has had to look at taking law it has adopted the tests under federal law. Both cases involved rent control ordinances. In the earlier case, *Nash v. City of Santa Monica,* 37 Cal.3d 97, 102, 207 Cal.Rptr. 285, 688 P.2d 894 (1984), *appeal dismissed,* —— U.S. ——, 105 S.Ct. 1740, 84 L.Ed.2d 807 (1985), the court applied the *Penn Central* test. *Citing Agins v. City of Tiburon,* 24 Cal.3d 266, 277, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), *aff'd* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), the court stated "we are aware of no authority which would impose different requirements under the California Constitution." *Nash,* 37 Cal.3d at 102, 207 Cal. Rptr. 285, 688 P.2d 894.

In the second case, *Fisher v. City of Berkeley,* 37 Cal.3d 644, 687, 209 Cal.Rptr. 682, 693 P.2d 261 (1984), the court held that in order to establish a taking the owner must be deprived of substantially all reasonable use of his property. Relying on *Euclid v. Ambler Realty Co.* and *Hadacheck v. Sebastian,* the court noted that even a significant diminution of value does not amount to a taking.

### C. *"Taking" Law as Applied to the Kinzli Property*

Plaintiffs have never pursued through to completion any permit application for development or other use of the property. Purchasers under conditional sales agreements have made application for a use clearly prohibited under Measure O. They did not pursue the application with any vigor and, indeed, it would have been futile to do so under Measure O. It is unlikely that any modification to the plans could be made that would satisfy the requirements of Measure O and the GBO and still interest the potential purchasers. However, the City maintains that some structures may be permitted on the property and urban services provided.

The legislative history of Measure O as well as its implementation are instructive. Cal.Gov't Code § 65563 requires that every city and county adopt a long-term general plan for development. Sections 65560 and 65563 mandate that one element of the plan be an open space plan as defined by § 65560.

Measure O requires that the City adopt as a part of its general plan provisions which carry out the policies of the Measure. The stated purposes of Measure O generally track the purposes of the open space lands Article of the Government Code, Art. 10.5. The permissible uses of property designated open space or greenbelt land in Measure O also track the uses of the State provisions. Although the term greenbelt, which has its origins in the new town legislation of England in the 1940's, *see* Mandelker, "Notes from the English: Compensation in Town and Country Planning," 49 Calif.L.Rev. 699, 704, *et seq.,* 719 (1961) ("... Green Belts are supposed to hold the urban fringe against further urban development."), generally refers to a preserved or undeveloped area around the perimeter of the City, its definition in Measure O is substantially the same as the Government Code definition of open space. Cal.Gov't Code § 65560.

The purposes of Measure O are to control urban growth, plan future develop-

ment including modest income housing and protect resources. The ordinance declares that "[i]t is critically important to the citizens of the City of Santa Cruz that the greenbelt lands described in this ordinance be preserved in the greenbelt land uses specified in this ordinance, and that they not be destroyed by premature and inappropriate development." Section 3.d.

As mandated by the Measure the City Council adopted the Greenbelt Overlay Ordinance. Plaintiffs contend that to the extent the GBO allows for other uses or additional services it is inconsistent with Measure O and is not the standard by which to determine whether a taking has occurred. It is the opinion of the City Council that the GBO is consistent with the purposes and policies of Measure O. The GBO added Ch. 24.53 to the Municipal Code and allows for single family dwellings and accessory buildings in addition to the uses spelled out in Measure O. It also permits the extension of urban services to the extent consistent with Measure O.

Defendants also point to the disclaimer clause of § 6 of the Measure which provides:

> This ordinance is not intended, and shall not be construed as authorizing the City of Santa Cruz to exercise its power in a manner which will take or damage private property for public use. This ordinance is not intended to increase or decrease the rights of any owner of property under the Constitution of California or the United States.

They argue that it was not the intent of the framers of Measure O, and the voters when they adopted it, that the Measure be used in any way so as to result in a taking. The actions of the City Council effectuate this intent, they claim.

### 1. *Interpreting Measure O*

■ "[T]he Constitution measures a taking of property not by what a state says, or by what it intends, but by what it *does.*" *Hughes v. Washington,* 389 U.S. 290, 298, 88 S.Ct. 438, 443, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring) (emphasis in original). However, the ordinance should be construed to preserve its constitutionality and its stated policy to avoid a taking, if that is consistent with the remainder of the ordinance. The provision should be interpreted to avoid internal conflict if at all possible. *See Serrano v. Priest,* 5 Cal.3d 584, 596, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977).

■ Contemporaneous interpretation by the legislative or administrative body having responsibility for implementing the ordinance, or ballot arguments accompanying the initiative may be looked to for guidance where the provisions are uncertain or ambiguous. If it is appropriate to consider these interpretations they are entitled to substantial deference. *See Santa Catalina Island Conservancy v. County of Los Angeles,* 126 Cal.App.3d 221, 238, 178 Cal.Rptr. 708 (1981); *Amador Valley Joint Union High School District v. State Board of Equalization,* 22 Cal.3d 208, 245–46, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978). There is sufficient room on the face of the ordinance to allow for interpretation.

"The determination of what harmonizes with the elements and objectives of ... [the general plan is] committed to the discretion of the local governing bodies." *Wheeler v. Gregg,* 90 Cal.App.2d 348, 361, 203 P.2d 37 (1949). The City Council's interpretation is consistent with the State's interpretation which allows for some appropriate structures or level of sensitive development. Measure O itself does not proscribe the building of additional structures. It restricts development that is inconsistent with its purposes and uses or threatens "premature and inappropriate development."

While some development of the Kinzli property may be permissible under the Measure and the implementing legislation, the hypothetical uses proffered by the City in this case are not consistent with the Measure and the underlying zoning. In addition, development of recreational vehicle parks or greenhouse cultivation flies in the face of the expressed principles set

forth in the City's own zoning ordinance that assure protection against incompatible uses. Municipal Code § 24.02.040. Nor has the City satisfactorily explained how plaintiffs could obtain the necessary conditional use permits or variances that would be required. *See* Municipal Code §§ 24.12.-260 and 24.12.410.

### 2. *Measure O Does not Deprive Plaintiffs of all Beneficial Uses*

However, this does not mean that the Kinzlis are denied all beneficial use of their property, unless of course their threshold theory is accepted that a beneficial or economically viable use must be one that provides a rate of return based upon the pre-Measure O value. They base this value on offers of purchase that assumed the property could be maximally exploited for development. For authority they look to direct condemnation actions. That, however, begs the question. In direct condemnation actions there is no question of taking, the taking is presumed. The question is one of value—the amount to be paid by the public entity taking the property. The question here, however, is whether in fact there has been a taking. Such determination requires consideration of all of the elements enumerated in *Penn Central*, including whether any viable economic use remains. The value may be substantially slashed, but the question is whether *after* such devaluation plaintiffs are left with any beneficial use.

 This court concludes that plaintiffs retain sufficient beneficial use of the property under Measure O to avoid a taking, especially under current Ninth Circuit law. The regulation in this case does not amount to an invasion. There has been no physical intrusion on any part of the land. Plaintiffs are not required to open up their premises for any public purpose whatsoever. Indeed, during the interim the City allows that they have undisturbed access across the right-of-way taken earlier.

The restriction in this case is temporary; it expires in 1991. While even a temporary restriction may constitute a taking, it must be looked at in the context of the entire regulatory impact. When considered together with the absence of any physical invasion, the restriction does not have a severe impact on plaintiffs' bundle of property rights.[6] They have the right to possession; they have the right to exclude others; they have the right to sell, transfer or encumber. The only right affected is the right of use and that right, while substantial, is not inviolate and must be balanced against the interest of the public as a whole.

Most importantly Measure O does not interfere with plaintiffs' reasonable investment-backed expectations. Plaintiffs have retained their property in an unimproved state. They have operated it at a loss for some time. They have held the property with the anticipation of sale for development at some time in the future. In early 1972 they made some attempt to sell the property and could have, but apparently waited for the construction of the Broadway-Brommer Road so as to maximize their profits. Serious attempts to sell were initiated again about the time Measure O appeared on the scene. Offers before and after the Measure were made conditioned upon substantial development projects. Measure O dashed plaintiffs' expectations of selling at pre-Measure O market value. But plaintiffs' expectations are not the reasonable expectations contemplated by the taking law. Plaintiffs waited to develop or sell their property and have suffered a loss. Their loss does not devolve into a taking.

Nor were plaintiffs' expectations investment-backed. In 1925 plaintiffs paid $25,-000 for a parcel larger than the current parcel. There is no debt servicing on the property. Plaintiffs have made no investments other than ordinary maintenance and carrying charges in contemplation of a reasonable expectation of development. The expectations of potential purchasers or de-

---

**6.** This bundle has been defined as the right "to possess, use and dispose" of the property. *Unit-* *ed States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945).

velopers do not inure to plaintiffs' benefit and, in any event, those expectations were not investment-backed or reasonable.

Plaintiffs are still free to use the property as they have. "[A]gricultural use of lands long devoted to that purpose is . . . a reasonable use." *Furey v. City of Sacramento,* 24 Cal.3d 862, 872, 157 Cal.Rptr. 684, 598 P.2d 844 (1979), *appeal dismissed, cert. denied,* 444 U.S. 976, 100 S.Ct. 476, 62 L.Ed.2d 403 (1979). They have failed to satisfy this court that there are no uses that will provide an income stream to the property, albeit not commensurate with pre-Measure O value.

### 3. *Current Ninth Circuit Law is in Accord*

In fact, plaintiffs are in much the same situation as the property owner in *Mac-Leod v. County of Santa Clara,* 749 F.2d 541 (9th Cir.1984), whose "ability to continue to hold the property for investment purposes, with interim uses of cattle ranch and grazing land, the very uses for which the property was purchased . . ." were not affected by the governmental action. Because MacLeod retained the right to continue to use the property in the same manner and to hold it as an investment, there was no interference with his investment-backed expectations. The court observed that "[h]olding property for investment purposes can be a 'use' of property" under taking law. *Id.* at 547 n. 7 (citing *Euclid v. Ambler Realty Co.,* 272 U.S. at 384, 47 S.Ct. at 117.)

Considering plaintiffs' original investment in the property, their profitable use of it over a substantial number of years, compensation received for other portions of it and the present depressed market value, it cannot be said that plaintiffs have suffered the kind of diminution that constitutes a taking. If plaintiffs were to sell their property under Measure O at market value they would realize a return on their original investment of approximately 6.28% compounded annually. If they were to sell it at the value urged by plaintiffs, $250,000, they would realize a return of 4.74% compounded annually. This represents a return for all years from 1925 to 1979 without regard to prior uses and sales of other portions.

### 4. *Other Applicable Law*

Other federal cases and state cases are instructive and do not compel a different result.

In another case in this district the court held that where the only plans submitted were far outside the parameters of the general plan, the owner had not fulfilled the requirements of *Agins* and could not challenge the restriction. Moreover, the mere frustration of the owner's plans for development, even though having a substantial economic effect, was not sufficient to constitute a taking where the uses to which the property was being put were not interfered with and it was only future economic returns that were implicated. The additional denial of urban services also did not result in a taking since there were no special benefits for which the owner had paid and of which he was now being deprived. *Oceanic California, Inc. v. City of San Jose,* 497 F.Supp. 962 (N.D.Cal. 1980).

The facts here are not as evocative as those in *Richmond Elks Hall Assoc. v. Richmond Redevelopment Agency,* 561 F.2d 1327 (9th Cir.1977), where the court found a taking had occurred. The City's redevelopment plan required the owner to rehabilitate the property at its own expense and to the specifications of the governmental agency. If the owner refused to sign an agreement requiring him to rehabilitate the property, the property would devolve to the City. It was established that the property was not saleable, that commercial lenders would not make loans and that uses and rights to rents and profits were substantially impaired. Here the City does not threaten to ultimately acquire the property. The restriction is temporary and the uses to which the property has been put are not affected.

At the other end of the spectrum plaintiffs who purchased property shortly before the adoption of an ordinance that subjected the property to a three year moratorium on development were unable to estab-

lish a taking even though they had made a sizeable investment and might have to sell their property at a substantial loss. *Sadowsky v. City of New York,* 732 F.2d 312 (2d Cir.1984). Plaintiffs had failed to show the property was unmarketable and, therefore, it was proper for the trial court to conclude that sale of the property was a possible use. *Id.* at 318 n. 3. The Second Circuit also gave weight to the character of the governmental action which, it concluded, had a "valid, even admirable, purpose." *Id.* While the equities in favor of plaintiffs here are greater than those operating in favor of the *Sadowsky* plaintiffs, the considerations are the same—the ones set forth in *Penn Central.*

Unlike *Urbanizadora Versalles,* 701 F.2d 993 (1st Cir.1983), there is no designation of plaintiff's property as reserved for future public use or condemnation. There is no lengthy dilatory precondemnation delay.

Also, unlike plaintiffs in *Hamilton Bank,* 729 F.2d 402 (6th Cir.1984), substantial sums have not been expended for development in reliance upon plan approvals subsequently rejected. The property in *Hamilton Bank* involved a total of 676 acres. Three to five million dollars had been expended on the entire project. A 245 acre easement of open space had been dedicated to the county, roads built and utility lines installed. A plan for the 258 remaining undeveloped acres was ultimately rejected because of changes in policy. It was not difficult for the court to find that distinct investment-backed expectations had been significantly interfered with. In addition it was uncontroverted that the property retained no significant value.

Perhaps more comparable, but on a grander scale, is the situation of the plaintiffs in *Furey v. City of Sacramento,* 592 F.Supp. 463 (E.D.Cal.1984). In 1959 the *Furey* plaintiffs purchased property zoned agricultural and made substantial recent capital investments in the property (unlike plaintiffs here). This was done in the expectation of future development. A few years later the City designated the property as open space. Prior to the court's decision some portions of the property had been sold off, but the owners were left with a sizeable portion of it which, again unlike plaintiffs' property, was profitable. After weighing the economic impact upon the owner and the public's interest in the open space zoning, the court concluded a taking had not been shown. One persuasive factor considered in weighing the burden shouldered by plaintiff was that it had already recovered a return on its investment in the property. Furthermore, the open space designation in *Furey* was not a temporary one.

### D. *Conclusion*

The court is not unsympathetic to plaintiffs' plight. The economic effect upon them is substantial. However, balancing the interests of the public in responsible, planned development against the temporary economic impact upon plaintiffs who have held the property in the family for well over 50 years and have only recently hoped to realize substantial gains from its sale or development, this court cannot find there has been a taking. Plaintiffs are left with the same uses to which the property had been put prior to Measure O. Their expectations are not reasonable or investment-backed. The *Penn Central* tests have not been met.