Filed 8/29/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ARRON BENEDETTI et al., <br><br>　　　Plaintiffs and <br>　　　Appellants, <br><br> v. <br><br> COUNTY OF MARIN, <br><br>　　　Defendant and <br>　　　Respondent; <br><br> CALIFORNIA COASTAL <br> COMMISSION, <br><br>　　　Real Party in Interest. | A170403 <br><br> (Marin County <br> Super. Ct. No. <br> CIV2103128) |

　　　Arron and Arthur Benedetti and the Estate of Willie Benedetti (collectively, Benedettis) appeal from the trial court's judgment denying their petition for writ of mandate and complaint for declaratory judgment and injunctive relief.[1]  The Benedettis' complaint challenged a new provision in the County of Marin's (county) amended local coastal program that allows owners of certain farm lands to build additional residential units so long as the property owner records a restrictive covenant in favor of the county that states the owner of the new units will be

---

[1] Where necessary to avoid confusion, we refer to the individual Benedettis by their first names.

1

actively and directly engaged in agriculture, which is defined as being directly engaged in commercial agriculture or leasing the property to a commercial agricultural producer. The Benedettis contend this provision is facially unconstitutional because it does not satisfy the nexus and proportionality requirements of *Nollan v. California Coastal Commission* (1987) 483 U.S. 825 (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (*Dolan*) and violates their substantive due process rights under the state and federal constitutions not to work in a specific occupation. We conclude, contrary to the trial court, that the Benedettis may raise a facial *Nollan/Dolan* claim. But we agree with the trial court that they have failed to show the provision is unconstitutional, so we affirm the judgment.

## BACKGROUND

### I. Legal background

The California Coastal Act of 1976 (Pub. Resources Code,[2] § 30000 et seq.; Coastal Act) " 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California.' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793.) The Coastal Act "requires local governments . . . to develop a local coastal program (LCP). The LCP, consisting of a land use plan (LUP) and implementing ordinances, is designed to further the objectives of the Coastal Act. [Citations.] The Coastal Act provides that a local government must submit its LUP to the

---

[2] Undesignated statutory citations are to the Public Resources Code.

2

California Coastal Commission (the [c]ommission) for certification that the LUP is consistent with the policies and requirements of the Coastal Act. [Citations.] After the Commission certifies a local government's LUP, it delegates authority over coastal development permits to the local government." (*Beach & Bluff Conservancy v. City of Solana Beach* (2018) 28 Cal.App.5th 244, 252 (*Beach & Bluff*).) A local government must also submit its implementing ordinances to the commission for approval. (§ 30513, subd. (a).)

The Coastal Act contains several provisions prioritizing the maintenance of agricultural land in the coastal zone. (§§ 30241–30242.) Most relevant here is section 30242, which states that lands "suitable for agricultural use" other than prime agricultural lands "shall not be converted to nonagricultural uses unless (1) continued or renewed agricultural use is not feasible, or (2) such conversion would preserve prime agricultural land or concentrate development . . . ." (See § 30241 [addressing preservation of prime agricultural lands, which are scarce in the county].)

## II. The county's LCP

The county's original LCP, which the commission originally certified in 1981, adopted a planned district zone, designated as the agricultural production zone (APZ), for all agriculturally-zoned lands in the coastal zone that fall outside the boundaries for community expansion. The principal use of APZ lands was agricultural, with a maximum density of 1 unit per 60 acres of development that were accessory, incidental, or in support of

3

agriculture. The permitted uses of APZ land were for agriculture; one single-family dwelling for each group of contiguous parcels under common ownership; and accessory structures appurtenant and necessary to agricultural uses, such as barns or corrals. Conditional uses included land divisions, farmworker housing, and mobile homes for the owner's employees who were actively and directly engaged in agriculture. Any land division or development required, among other things, a master plan showing that the proposed division or development would protect and enhance continued agricultural use and was necessary because agricultural use of the property was no longer feasible. Development also required permanent conservation easements allowing only agricultural uses over the portion of a property not developed.

## III. The county's amended LCP

The county's amended LUP, which is part of its amended LCP and which the commission certified in 2019, continues to limit the use of land in the APZ, renamed the coastal APZ (C-APZ), to agriculture or accessory and supporting uses and to restrict land divisions and non-agricultural uses. The amended LUP allows residential development in other zones, such as the coastal agricultural residential planned zone and the coastal residential agricultural district. The amended LUP's policies were designed to protect and strengthen agriculture while also deterring the incursion of non-agricultural uses that would convert agricultural land. But the amended LUP also recognizes

4

that farmworker housing is an integral part of many agricultural operations.

The amended LCP's implementing ordinances state that the principal permitted uses of lands in the C-APZ are agriculture, defined as agricultural production, agricultural accessory structures and activities, agricultural dwelling units, sale and processing of products grown on the farm, and non-profit educational tours. Agricultural dwelling units consist of one farmhouse or one farmhouse and one intergenerational home per farm tract, and agricultural worker housing with up to 36 beds in group living quarters. A farm tract is all contiguous lots under common ownership. An intergenerational home is an agricultural dwelling unit occupied by occupants authorized by the farm owner or operator actively and directly engaged in agricultural use of the property. Conditional uses include a second intergenerational home, worker housing above 36 beds per lot, and land divisions.

Each agricultural dwelling unit must be owned by a farmer or operator "actively and directly engaged in agricultural use of the property." Development of a farmhouse or intergenerational home also requires the recording of a restrictive covenant running with the land for the benefit of the county ensuring that any use will be in conformance with zoning restrictions, prohibiting the future division of the lot containing the unit except for a lease of the rest of the lot for agricultural use, and assuring that the owner of the unit will be "actively and directly engaged in agricultural use" of the lot and the use of the lot will

5

be restricted to agriculture. "Actively and directly engaged" is defined to mean "making day-to-day management decisions for the agricultural operation and being directly engaged in production of agricultural commodities for commercial purposes on the property or maintaining a lease to a bona fide commercial agricultural producer."

The commission's staff explained in response to public comments on the draft implementation plan for the amended LUP that the amended LCP (both the LUP and implementing ordinances) were intended to ensure that the values of agricultural land would be driven by agricultural uses rather than residential uses, to maintain the economic appeal of agriculture and control the cost of agricultural land.

## IV. The litigation

Before his death in 2018, Willie owned 267 acres of land across two contiguous parcels in the C-APZ. Willie operated two agricultural companies, and Arthur and Arron currently both have roles in the companies. However, Arron and Arthur are both full-time plumbers. Neither Arron nor Arthur is engaged in day-to-day operations of the companies, and neither they nor the companies are engaged in agricultural activity on the property. Poultry companies rent buildings on the property at times, but not year-round.

One of the two parcels has a residential structure. Willie lived in the home with Arron before Willie's death, and he intended to build another home on his property for Arthur. Arthur now wishes to build the second residence for himself.

Willie's will devises the parcels separately to his sons, one to Arron and one to Arthur.

After the county's board of supervisors adopted the implementing ordinances for the amended LCP in 2021, the Benedettis challenged them by filing a petition for writ of mandate and complaint for declaratory relief against the county. The Benedettis alleged in their first cause of action that the restrictive covenant condition forcing a landowner to engage in an occupation in exchange for a development permit was facially unconstitutional under the unconstitutional conditions doctrine. They alleged the restrictive covenant condition was unconstitutional because it violated their due process rights under the state and federal constitutions and because it could never satisfy the nexus and proportionality requirements under the federal constitution as established in *Nollan/Dolan*. The Benedettis also alleged a cause of action for writ of mandate under Code of Civil Procedure section 1085.[3]

In an order addressing a demurrer filed by the county and the commission (collectively, "joint parties"), the trial court ruled that the Benedettis could not allege a facial takings challenge based on *Nollan/Dolan*. Later, applying rational basis review, the trial court denied the Benedettis' petition and complaint based on their due process theory.

---

[3] The Benedettis also alleged a cause of action for writ of mandate under Code of Civil Procedure section 1094.5. The trial court sustained the joint parties' demurrer to that cause of action with leave to amend. The Benedettis did not amend their complaint and do not challenge this ruling on appeal.

7

## DISCUSSION

### I. Standard of review

" 'In evaluating a facial challenge, a court considers "only the text of the [challenged enactment] itself, not its application to the particular circumstances of an individual." [Citation.] The California Supreme Court has not articulated a single test for determining the propriety of a facial challenge. [Citation.] Under the strictest test, the [enactment] must be upheld unless the party establishes the [enactment] " 'inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions.' " [Citation.] Under the more lenient standard, a party must establish the [enactment] conflicts with constitutional principles " 'in the generality or great majority of cases.' " [Citation.] Under either test, the plaintiff has a heavy burden to show the [enactment] is unconstitutional in all or most cases, and " 'cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the [enactment].' " ' " (*Beach & Bluff*, *supra*, 28 Cal.App.5th at p. 264.)

" 'Facial challenges to statutes and [local enactments] are disfavored. Because they often rest on speculation, they may lead to interpreting [enactments] prematurely, on the basis of a bare-bones record. [Citation.] Also, facial challenges conflict with the fundamental principle of judicial restraint that courts should not decide questions of constitutional law unless it is necessary to do so, nor should they formulate rules broader than required by the

8

facts before them.' " (*Beach & Bluff, supra,* 28 Cal.App.5th at p. 263.)

"The interpretation of a legislative enactment and the determination of its constitutionality are questions of law we review de novo.  [Citation.]  '[W]e start from "the strong presumption that the [enactment] is constitutionally valid."  [Citation.]  "We resolve all doubts in favor of the validity of the [enactment].  [Citation.]  Unless conflict with a provision of the state or federal Constitution is clear and unmistakable, we must uphold the [enactment]." ' " (*Beach & Bluff, supra,* 28 Cal.App.5th at p. 264.)

## II. Takings Claim

### A. Legal Overview

"As a general matter, the unconstitutional conditions doctrine imposes special restrictions upon the government's otherwise broad authority to condition the grant of a privilege or benefit when a proposed condition requires the individual to give up or refrain from exercising a constitutional right." (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 457.)  The Supreme Court has applied the unconstitutional conditions doctrine to protect various rights, including the rights of free speech and travel.  (*Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 604 (*Koontz*).)

"*Nollan* and *Dolan* 'involve a special application' of this doctrine that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits."  (*Koontz, supra,* 570 U.S. at p. 604.)

9

Those cases established a two-part test to determine whether a permit condition is an unconstitutional taking.  (*Sheetz v. County of El Dorado, California* (2024) 601 U.S. 267, 275 (*Sheetz*), revg. *Sheetz v. County of El Dorado* (2022) 84 Cal.App.5th 394.)  "First, permit conditions must have an 'essential nexus' to the government's land-use interest.  [Citation.]  The nexus requirement ensures that the government is acting to further its stated purpose, not leveraging its permitting monopoly to exact private property without paying for it.  [Citation.]  Second, permit conditions must have ' "rough proportionality" ' to the development's impact on the land-use interest.  [Citation.]  A permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from new development has the same potential for abuse as a condition that is unrelated to that purpose."  (*Sheetz,* at pp. 275–276.)

The *Nollan/Dolan* test "applies regardless of whether the condition requires the landowner to relinquish property or requires her to pay a 'monetary exactio[n]' instead of relinquishing the property."  (*Sheetz, supra,* 601 U.S. at p. 276.)  The Supreme Court also made clear last year that the test applies equally to fees or conditions imposed administratively as well as legislatively.  (*Id.* at pp. 276, 279.)  However, "there can be no valid unconstitutional-conditions takings claim without a government exaction of property."  (*California Building Industry Assn. v. City of San Jose, supra,* 61 Cal.4th at p. 457.)  A regulation that "simply restricts the use of property without demanding the conveyance of some identifiable protected

10

property interest (a dedication of property or the payment of money) as a condition of approval" does not bring the unconstitutional conditions doctrine into play. (*Id.* at p. 460.)

## B. Viability of a facial *Nollan/Dolan* Claim

The trial court denied the Benedettis' takings claim because it concluded they could not bring a facial *Nollan/Dolan* claim. It reached this conclusion largely based on *Beach & Bluff*, *supra*, 28 Cal.App.5th 244. As relevant here, that case concerned a *Nollan/Dolan* challenge via petition for writ of mandate and complaint for declaratory judgment against certain policies in an amended LCP governing the repair or replacement of stairways and shoreline or bluff protective devices. (*Id.* at pp. 252, 254–255, 263.) The court rejected the plaintiffs' argument based on the unconstitutional conditions doctrine because it concluded "the doctrine, with its attendant *Nollan/Dolan* test, generally is not applied to facial challenges." (*Id.* at p. 267, italics omitted.) It relied in part on *Action Apartment Assn. v. City of Santa Monica* (2008) 166 Cal.App.4th 456, 470, which in turn followed *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 670, to hold that the *Nollan/Dolan* test governed only individual adjudicative permit approval decisions and fees, not generally applicable legislative general zoning decisions or development fees.[4] (*Beach & Bluff*, at pp. 267–268.)

---

[4] While *San Remo Hotel v. City and County of San Francisco*, *supra*, 27 Cal.4th at page 649, fn. 1, applied only the California Constitution's takings clause, the court acknowledged that in all aspects relevant here it interprets the state and federal takings clauses "congruently" (*id.* at p. 644).

11

The court also cited section 30010, which states the Legislature's view that the Coastal Act "is not intended, and shall not be construed as authorizing the commission . . . or local government acting pursuant to this division to exercise their power to grant or deny a permit in a manner which will take or damage private property for public use, without the payment of just compensation therefor." (*Beach & Bluff, supra,* 28 Cal.App.5th at pp. 271–272.) The *Beach & Bluff* court held that entertaining a facial challenge to the LCP policies at issue there would have deprived the local government and the commission of the opportunity under section 30010 to apply the policies in a way to avoid resulting in a taking or having to pay compensation for one, "such as exempting the property from the regulation, amending the regulation, or rescinding the regulation." (*Beach & Bluff,* at p. 272.)

While the trial court's reliance on *Beach & Bluff* was understandable when it ruled in July 2023, this aspect of *Beach & Bluff* is no longer good law after *Sheetz*, which was decided in April 2024. *Sheetz, supra,* 601 U.S. at page 270 expressly rejected the notion that "*Nollan* and *Dolan* apply only to permit conditions imposed on an ad hoc basis by administrators" and held that the Takings Clause "does not distinguish between legislative and administrative permit conditions." *Sheetz* itself vacated and remanded a Court of Appeal decision that had followed *San Remo Hotel v. City and County of San Francisco.* (See *Sheetz v. County of El Dorado, supra,* 84 Cal.App.5th at p. 410.) *Sheetz* therefore abrogated *San Remo Hotel v. City and*

12

*County of San Francisco* and *Action Apartment Assn. v. City of Santa Monica* in this respect, as well as this aspect of *Beach & Bluff*.

The joint parties resist this conclusion, noting that the challenge in *Sheetz* was as applied, not facial. This is true but irrelevant. Because the challenge was as applied, *Sheetz* had no occasion to address whether a plaintiff could state a facial *Nollan/Dolan* challenge. But by sweeping away the distinction between legislative and administrative actions for the purposes of *Nollan/Dolan*, *Sheetz* eliminated the logical foundation for *Beach & Bluff*'s conclusion that *Nollan/Dolan* cannot be applied facially.

The joint parties also argue that allowing a facial *Nollan/Dolan* challenge to the restrictive covenant requirement would deprive them of their discretion under section 30010 to apply the requirement constitutionally, such as by relaxing the requirement where necessary to avoid a taking. They assert that because the Benedettis have not applied for a development permit, the joint parties have not committed to any final, definitive position regarding how they would apply the restrictive covenant condition to anyone. We have no quarrel with the notion that some permit conditions can be altered or relaxed in specific circumstances to avoid constitutional problems and that this can preclude a facial challenge. However, section 30010's takings-avoidance mechanism can only foreclose a facial challenge to a permit condition if the permit can be applied constitutionally in some cases but not others. Where a party argues that a permit condition will always be a taking in every

13

instance where it is applied, giving the county or commission discretion to waive the condition serves no purpose. If the Benedettis' challenge has merit, the county or commission must waive the condition in every instance when requested by a landowner. Having a court declare such a condition unconstitutional would thus not deprive the county or commission of the exercise of any expertise or discretion. It would also be unjust to require only as-applied challenges to such a condition and allow it to otherwise remain in force, since it would deter landowners from properly exercising their rights.

The Benedettis' takings challenge is mostly consistent with the tests our Supreme Court has established for facial challenges. With one exception that we mention *post*, the Benedettis contend the restrictive covenant condition can never satisfy the nexus or proportionality requirements, regardless of the specific circumstances of the landowner who applies to build a new agricultural dwelling unit. This mirrors the more stringent test that requires a plaintiff to demonstrate a legislative enactment's provisions " ' " 'inevitably pose a present total and fatal conflict with applicable constitutional provisions' " ' " (*Beach & Bluff*, *supra*, 28 Cal.App.5th at p. 264), so the Benedettis' takings claim is suitable for resolution as a facial challenge. Because it meets the more stringent standard, it is necessarily also suitable under the less onerous approach that looks at whether an enactment creates constitutional problems at least " ' " 'in the generality or great majority of cases.' " ' " (*Ibid.*)

In a variation on this theme, the joint parties assert that the Benedettis cannot bring a facial *Nollan/Dolan* challenge because the restrictive covenant condition operates through a permit process, so that the amended LCP does not impose any exaction on a landowner until the landowner applies for a permit to develop an agricultural dwelling unit. They again cite *Beach & Bluff,* but this contention fares no better.

In the alternative to its blanket conclusion that a facial *Nollan/Dolan* challenge automatically fails, *Beach & Bluff* rejected a facial challenge to one permit condition requiring conversion of private stairways to public stairways because it turned on questions of whether conversion was " 'feasible,' " whether public access could " 'reasonably be provided,' " and whether the stairway in question already partially used public land or land subject to a public access requirement. (*Beach & Bluff, supra*, 28 Cal.App.5th at p. 269.) The court found it impossible to consider *Nollan/Dolan*'s application to these considerations except on a case-by-case basis. (*Ibid.*) The other condition at issue in *Beach & Bluff* prohibited the use of certain bluff protective devices to protect new development and required landowners receiving permits for new development or blufftop redevelopment to record deed restrictions waiving any future right to construct such devices. (*Id.* at p. 270.) The court rejected a facial challenge to that condition because new development or blufftop redevelopment might or might not occur on specific properties in the future and because the economic harm to property owners could only be determined on a case-by-case

15

basis. (*Ibid.*) The court also reasoned that the required deed restriction would simply limit the use of property and was not a conveyance of an identifiable protected property interest, so it was not an exaction. (*Id.* at p. 271.)

These rationales do not persuade us that the Benedettis cannot bring a facial challenge to the restrictive covenant condition here. The restriction will apply to any landowner who seeks a permit for an agricultural dwelling unit, so there is no question about whether it will apply in the future.[5] The universal application of the condition and general nature of the Benedettis' challenge also means there is no need to consider whether or how the condition will apply to a particular property or landowner. The Benedettis do not seek economic relief, so there is no need to consider specific property uses or values. The restrictive covenant condition also requires a covenant running with the land in favor of the county that affirmatively requires the owner of an agricultural dwelling unit to engage in

---

[5] We disagree with *Beach & Bluff*'s conclusion that the possibility that some landowners will not seek to develop their properties in the future precludes a facial challenge to a condition of such development. " 'Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.' " (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 345 (plur. opn. of George, C. J.).) A condition of development will always be irrelevant to any landowners who do not seek to develop their property, but that does not preclude a facial challenge to the application of the condition to landowners who do.

agriculture or lease the property to someone who will. A restrictive covenant prohibiting development of a property that runs in favor of a third party is itself a property interest for which compensation is owed to the third party when the restriction is violated in eminent domain proceedings. (*Southern California Edison Co. v. Bourgerie* (1973) 9 Cal.3d 169, 171.) Accordingly, the requirement that a landowner record a restrictive covenant in the county's favor as a condition of receiving a permit constitutes the exaction of an identifiable property interest.[6]

Our conclusion that the Benedettis' challenge to the restrictive covenant condition can largely proceed facially is consistent with two cases, one of which *Beach & Bluff* discussed and another that was decided later. *Levin v. City and County of San Francisco* (N.D. Cal. 2014) 71 F.Supp.3d 1072, 1074, 1081, concerned a challenge to an ordinance requiring a rental property owner to pay a lump sum to displaced tenants in exchange for a permit allowing the property owner to withdraw the property from the rental market. The district court held the ordinance was facially unconstitutional because it necessarily imposed a monetary exaction in all of its applications and the monetary

_____

[6] To the extent that *Beach & Bluff* cannot be distinguished on the basis that the restrictive covenant here affirmatively requires the property owner to engage in certain conduct (as opposed to waiving rights), we disagree with *Beach & Bluff*'s conclusion that the recording of a deed restriction waiving a property development right does not convey a property interest. (*Beach & Bluff, supra,* 28 Cal.App.5th at pp. 270–271.)

17

exaction failed the nexus and rough proportionality tests. (*Id.* at pp. 1084, 1086, 1089.) *Levin* demonstrates that a facial constitutional challenge is appropriate when a party raises an unconstitutional conditions argument that an enactment will impose a taking regardless of how a governmental entity applies it in any particular case.

*Beach & Bluff* dismissed *Levin* as an "anomaly" that only allowed a facial challenge because the amount of the lump sum payment required could be calculated precisely in advance and legislative demands for money may be challenged immediately without a prior damages suit. (*Beach & Bluff*, *supra*, 28 Cal.App.5th at pp. 268–269.) But the calculability of the lump sum was not the point in *Levin*. The case turned instead on the nature of the challenge and whether the ordinance at issue was unconstitutional in all of its applications, regardless of the circumstances of any particular property or landowner. And while *Beach & Bluff* at page 269 also correctly noted that *Levin* is not binding authority, unlike *Beach & Bluff*, we find *Levin*'s reasoning persuasive here.

*Alliance for Responsible Planning v. Taylor* (2021) 63 Cal.App.5th 1072, 1075–1077, 1085, concerned an initiative ordinance that required a developer, as a condition of approval of the developer's project, to build roads that would benefit other projects. The court held that a facial unconstitutional conditions challenge to the ordinance was ripe because the challenge did "not depend on the application of the measure to a particular petitioner or future County interpretation." (*Id.* at p. 1082.) The

18

county had not yet had the opportunity to implement the ordinance constitutionally, but this did not convince the court that the challenge was unripe.  (*Ibid.*)  The challenge turned on whether the ordinance was reasonably susceptible to a constitutional interpretation, which did not depend on the application of the ordinance to any particular person.  (*Ibid.*)  The court also noted that because it concluded the ordinance could not be interpreted constitutionally, "delaying consideration could only serve to impose unconstitutional conditions or delay on developers and spur unnecessary litigation." (*Id.* at pp. 1082–1083.)  Similarly here, because the Benedettis' challenge mostly does not depend on the application of the restrictive covenant condition to any particular landowner or property and delaying resolution of the challenge would be unjust if the challenge has merit, the challenge is suitable for facial resolution.  The joint parties dismiss *Alliance for Responsible Planning* as anomalous and contend it considered only ripeness, not the viability of a facial challenge.  However, the court's ripeness reasoning applies equally to the question of whether a facial challenge is available, and it is consistent with *Levin*, so it supports our conclusion.

In sum, because the Benedetti's *Nollan/Dolan* challenge to the restrictive covenant requirement, with one minor exception discussed at pages 23–24, *post*, does not require consideration of any individual property or landowner, we may entertain it as a facial challenge.

## C. Application of *Nollan/Dolan*

We turn now to the merits of the Benedettis' challenge, which requires us to consider whether the restrictive covenant requirement has a nexus to the harm to the government's land use interest and whether it is roughly proportional to the impact on that interest from the development of an agricultural dwelling unit. (*Sheetz, supra,* 601 U.S. at pp. 275–276.) On the nexus question, the Benedettis argue that the Supreme Court requires a direct and individualized connection, something more than a generalized connection between an exaction and broader social goals. But they cite to *Dolan* for the requirement of a direct and individualized connection, which we discuss *post*. *Nollan* required only a reasonable relationship between a condition and the public need or burden to which a development contributes because the Court found the condition at issue there did "not meet even the most untailored standards." (*Nollan, supra,* 483 U.S. at p. 838.) In any event, the restrictive covenant condition at issue easily meets the nexus requirement, regardless of whether the joint parties must establish a reasonable relationship or a direct connection between the condition and their land use interests.

The joint parties' relevant land use interests in the Coastal Act and the county's LCP are to maintain the agricultural industry in the coastal zone, by separating agricultural from non-agricultural uses and preventing residential use values from driving up the costs of agricultural land. (§ 30242.) The restrictive covenant condition plainly has a nexus to this interest.

20

Allowing further residential development of a farm tract would begin to erode the distinction between agricultural and residential uses of the land unless the residential development is tied to the agricultural use in some fashion. At the same time, limited development is necessary because farmworker housing is an integral part of many agricultural operations. The restrictive covenant condition threads the needle between these competing concerns and satisfies them both by only allowing development of agricultural dwelling units that will be used to support agricultural use of the property. This is a direct connection, not a generalized one, and a much closer fit than a reasonable relationship.

According to the Benedettis, there can never be a nexus because a requirement that property owners engage in agriculture is not related to the impacts of residential development on issues such as traffic, utilities, or environmental resources. This argument mistakes the nature of the joint parties' interest. The joint parties are interested in maintaining the viability of agriculture and restricting the use of agricultural lands for residential purposes. The interest behind the restrictive covenant condition is not mitigating the general impacts of residential development.

The Benedettis point out repeatedly that the development of a residential dwelling does not change the underlying zoning of the property, which already limits the property to agricultural use while allowing residential dwellings as a principal permitted use. They maintain that the construction of a dwelling without

the covenant would not prevent individuals in the C-APZ from engaging in agriculture and the restrictive covenant approach could actually discourage the expansion of agriculture in the county by imposing onerous restrictions on development. But even if construction of an additional unrestricted residential unit would not itself prevent use of surrounding land for agriculture, it could increase the development value of agricultural land and thus contribute to making agricultural uses less economically viable or attractive. By tying the availability of a development permit to the continued use of a property for agriculture, the restrictive covenant requirement ensures that only residential development that is consistent with and furthers or incentivizes agriculture will take place. Also, contrary to the Benedettis' prediction about onerous restrictions, allowing additional residential development where necessary for agriculture should facilitate the expansion of agricultural operations. It should certainly encourage more expansion of agriculture than the original LCP's approach of entitling owners to only one single-family dwelling per group of contiguous parcels under common ownership.

In a related vein, the Benedettis note that the LCP strictly limits non-agricultural uses in the C-APZ zone. They speculate that the development of agricultural dwelling units without a restrictive covenant would not detract from this and would actually increase the number of individuals available to engage in agriculture, implying the covenant is unnecessary. While the C-APZ zoning limits the uses of the property, it still allows for

22

residential uses, as the Benedettis also note. The zoning therefore means little if additional residential development is permitted that is not restricted to development actually necessary to support agricultural uses. For example, if the owners of a farm tract build a second residential dwelling to live in while leaving the farm unused (as the Benedettis themselves state they intend to do), the development de facto converts the property into a residential property and contributes to a market for residential real estate in agricultural areas. The Benedettis cite nothing in the C-APZ zoning restrictions or any other law or ordinance that would prevent this from occurring in the absence of an ongoing obligation to use the property for agriculture as a condition of building the second dwelling. The restrictive covenant condition seeks to address this specific problem and maintains a direct connection between the exaction and the impacts of the development on the joint parties' land use interest in ensuring the viability of agriculture.

Turning now to *Dolan*, the Benedettis first contend the restrictive covenant requirement fails *Dolan*'s rough proportionality test because it is not related to the impacts of development. This is simply a restatement of the Benedettis' *Nollan* nexus argument and is not persuasive for the same reasons.

The Benedettis next fault the condition for applying equally to farmhouses, intergenerational homes, and agricultural worker housing, without regard to the size, location, or characteristics of the proposed development. *Dolan, supra,* 512 U.S. at page 391,

23

did not require a precise mathematical calculation, merely " 'rough proportionality,' " which the Court explained consisted of an individualized determination that a condition was related in both nature and extent to the impact of a proposed development. The restrictive covenant condition meets this test on its face, since residential development of any size or type that is not required and used to support ongoing agriculture begins to establish a market for residential development and erode the viability of agriculture. To the extent that the Benedettis are arguing that the restrictive covenant condition would be disproportional for an agricultural dwelling unit of a specific type, size, or location, their argument is no longer a facial challenge. Rather, such an argument is a challenge that the condition would be unconstitutional as applied to a specific context. We cannot rule upon it in the context of the Benedettis' facial challenge here.

Finally, the Benedettis point out that the restrictive covenant condition will last in perpetuity, which they argue is facially disproportional. But the joint parties apparently intend to preserve the viability of agriculture in the C-APZ in perpetuity, so it makes sense to have the condition last that long as well. Otherwise, the covenant would merely slow the transition away from agriculture without actually stopping it.

The Benedettis compare this case to *Alliance for Responsible Planning v. Taylor*, *supra*, 63 Cal.App.5th at pages 1085–1087, which held that an ordinance requiring the developer of one development to build roads that would benefit other

24

developments was not proportionate to the first development's impacts. But the cases are not similar. Nothing in the restrictive covenant condition requires a landowner to contribute towards ameliorating the effects of other developments. The problem the joint parties have identified is that any residential development in the C-APZ not used for agriculture makes a small but incremental contribution towards converting the market for agricultural lands into a market for residential land, thereby eroding the viability of agriculture. By requiring each residential development in the C-APZ to be used for agriculture, the restrictive covenant condition addresses each development's own incremental effect. The condition is thus proportional to each development's impact.

## III. Due Process Claim

In addition to their *Nollan/Dolan* argument, the Benedettis contend the restrictive covenant condition is facially unconstitutional because it violates their rights to due process. The Benedettis contend that strict scrutiny applies because they contend the restrictive covenant condition violates their fundamental right to work. However, *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97 (*Nash*), which all parties agree is the closest case on point, rejected this argument.

At issue in *Nash* was a charter provision preventing a landowner from demolishing or converting rental units without a permit. (*Nash*, *supra*, 37 Cal.3d at pp. 100–101.) The charter provision made a permit available only if the rental units were not occupied by low or moderate income tenants, the units could

25

not be afforded by low or moderate income tenants, removal would not adversely affect the housing supply, and the owner could not make a reasonable return on his investment. (*Id.* at p. 101.) An owner of a rental apartment building challenged the charter provision as unconstitutional because it conditioned his fundamental right to cease doing business as a landlord on relinquishment of his right not to sell his property. (*Id.* at pp. 103–104.)

The California Supreme Court refused to apply strict scrutiny. (*Nash, supra,* 37 Cal.3d at p. 104.) It explained, "All regulation of property entails some limitation upon the liberty of the owner; and, to the extent that the regulation limits the uses to which the property may be put, it entails limitation upon the owner's liberty to pursue his chosen occupation or business at that location. If the owner wishes to pursue his preference, he may be constrained to sell his property and move elsewhere. If the value of his property has decreased as a result of the regulation, he may perceive that to be an undesirable alternative, and to that extent feel economically constrained to continue in his present field of endeavor. Yet, the existence of these legal and de facto limitations upon his freedom of choice do not operate to subject the property regulation to a strict scrutiny test, under modern legal principles." (*Ibid.*) The court also observed that the plaintiff was "not being called upon to operate a business or engage in a profession unrelated to the property; his landlordly obligations are those which arise out of the ownership of the sort of property which he acquired." (*Id.* at p. 105.) The court

distinguished such obligations from personal services not attached to the land. (*Ibid.*)

Nash rejected the argument that the charter provision in question forced upon the plaintiff an occupation chosen by the state. (*Nash, supra,* 37 Cal.3d at pp. 102–103.) It noted that the plaintiff remained "free to minimize his personal involvement by delegating responsibility for rent collection and maintenance to a property manager." (*Id.* at p. 103.) The court also pointed out that the plaintiff could withhold rental units from the market as they became vacant or sell his property and invest the proceeds. (*Ibid.*)

Instead of strict scrutiny, *Nash* applied rational basis review. (*Nash, supra,* 37 Cal.3d at p. 103.) "Both federal and state Constitutions protect against deprivation of property without due process of law. Yet, ' "[i]t is thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires." ' [Citation.] Thus, an ordinance restrictive of property use will be upheld, against due process attack, unless its provisions 'are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " (*Ibid.*; see also *Nash,* at pp. 108–109 [due process test under California Constitution

"requires that the regulation be 'procedurally fair and reasonably related to a proper legislative goal' "].)[7]

Following *Nash*, as we must, we conclude the Benedettis' argument for strict scrutiny falls flat. The restrictive covenant condition does not obligate landowners to work in agriculture; they are only limited in their ability to work in fields other than agriculture on a specific property. Additionally, the condition does not raise concerns about involuntary servitude or requiring landowners to perform personal services because it only obligates the landowners to engage in agriculture, which is an occupation quintessentially arising out of and attached to their land. The restrictive covenant condition leaves the landowners free to lease the property to someone else to engage in agriculture. They can also choose to sell the property if they no longer wish to engage in agriculture.

Because strict scrutiny does not apply, we consider only whether the restrictive covenant condition is arbitrary, unreasonable, or unrelated to the general welfare or a proper legislative goal. (*Nash*, *supra*, 37 Cal.3d at pp. 103, 108–109.) We find a reasonable relationship between the condition and the general welfare and a proper legislative goal for the reasons set forth *ante* regarding the Benedettis' *Nollan/Dolan* challenge. The joint parties' legislative goal is the maintenance of agriculture as

---

[7] The Legislature enacted the Ellis Act (Gov. Code, § 7060 et seq.) to statutorily prohibit measures like the charter provision at issue in *Nash*. (*Drouet v. Superior Court* (2003) 31 Cal.4th 583, 589–590.)

28

a viable industry in the coastal zone by preventing the incursion of residential development and residential property values into agricultural lands, while also allowing for housing in support of agricultural work.  The restrictive covenant is reasonably related to that goal because it ties the availability of further residential development of agricultural parcels to a commitment to continue to use the parcels for agriculture.

The Benedettis rejoin that while the charter provision in *Nash*, *supra*, 37 Cal.3d at page 103 allowed the landlord to withdraw units from the market as they became vacant and to demolish the building if he could not make a fair return on his investment or wished to withdraw from being a landlord, the restrictive covenant condition contains no exceptions for the potential scenario in which commercial agriculture on a property becomes unprofitable or the landowner wants to retire.  It is true that the restrictive covenant condition does not provide exceptions for such eventualities, but *Nash* did not suggest that such features were essential to the constitutionality of the ordinance there.  Landowners remain free to sell the property to escape the condition or lease the property to satisfy it.  The Benedettis argue in a single sentence that the First Amendment protects the right not to associate (*Roberts v. U.S. Jaycees* (1984) 468 U.S. 609, 623) and a compelled lease would violate this right. But they cite nothing to suggest that a commercial lease of land for agriculture would qualify as a forced association for First Amendment purposes.

29

The Benedettis distinguish *Nash* as concerning a property that was already in use as a rental property when the plaintiff acquired it (*Nash, supra,* 37 Cal.3d at pp. 101, 105), whereas landowners in the C-APZ may not yet be engaged in agriculture when they seek to develop their land. But the plaintiff in *Nash* received his property apparently as a gift, and nothing in *Nash* suggests the court's reasoning about the plaintiff's right to work argument turned on when or how the plaintiff became a landlord. (See *id.* at pp. 101, 104–105.)

In any event, we need not decide whether the restrictive covenant condition would be unconstitutional in the hypothetical scenarios the Benedettis describe. A plaintiff bringing a facial challenge " ' " 'cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the [enactment].' " ' " (*Beach & Bluff, supra,* 28 Cal.App.5th at p. 264, italics omitted.) The Benedettis offer no reason to believe their hypotheticals regarding lands where agriculture is no longer profitable or landowners that seek to develop land without having previously engaged in agriculture represent " ' " 'the generality or great majority of cases' " ' " (*ibid.*) in which the condition will be applied, so this argument does not allow us to declare the condition unconstitutional on its face. The condition can be constitutionally applied outside of these hypotheticals to landowners whose lands have been and can still be used profitably for agriculture, which is enough to defeat the Benedettis' facial challenge here.

# DISPOSITION

The judgment is affirmed.


                                              BROWN, P. J.

WE CONCUR:

GOLDMAN, J.
POLLAK, J.*

*Benedetti et al. v. Marin County*  (A170403)

---

\* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:      Marin County Superior Court

Trial Judge:      Hon. Andrew E. Sweet

Counsel:      Pacific Legal Foundation, Jeremy Talcott, Johanna Talcott and Jeffrey W. McCoy for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Shari B. Posner and Stephanie Lai, Deputy Attorneys General; Brian Washington, County Counsel, and Brandon W. Halter, Deputy County Counsel, for Defendant and Respondent and for Real Party in Interest.